OPINIONS OF THE SUPREME COURT OF OHIO
        The full texts of the opinions of the Supreme Court of Ohio
are being transmitted electronically beginning May 27, 1992,
pursuant to a pilot project implemented by Chief Justice Thomas
J. Moyer.
        Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Whitten, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.  Your
comments on this pilot project are also welcome.
        NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised to
check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.  The
advance sheets to Ohio St.3d will also contain the volume and
page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

The State of Ohio, Appellant, v. Storch, Appellee.
[Cite as State v. Storch (1993),        Ohio St. 3d        .]
Evidence -- Child statements in abuse cases -- Evid.R. 807
        accords the right of confrontation guaranteed by both the
        Ohio and United States Constitutions -- Evid.R. 807
        contemplates that pretrial hearing will be conducted at
        which time ability of child to testify should be addressed
        and initial determination as to admissibility of child's
        statements should be made.
1.  Evid.R. 807 accords with the right of confrontation guaran-
        teed by both Section 10, Article I of the Ohio Constitution
        and the Sixth Amendment to the Constitution of the United
        States.
2.  Evid.R. 807 contemplates that a pretrial hearing will be con-
        ducted at which time the ability of the child to testify
        should be addressed and an initial determination as to the
        admissibility of the child's statements should be made.
        (No. 91-2218 -- Submitted February 9, 1993 -- Decided May
19, 1993.)
        Appeal from the Court of Appeals for Erie County, No.
E-90-18.
        On Sunday, February, 19, 1989, three-year-old A.M. was
visiting at the home of her father, Ricky A. Mingus.  A.M.'s
parents were divorced and her mother had been named the
residential parent.  At least in part because A.M.'s mother had
been dating Richard Storch before the divorce occurred, no love
was lost between Ricky Mingus and Richard Storch.  Indeed, the
relationship was so bad that Mingus customarily took a third
party with him when he went to pick up his daughter at the home
shared by Storch and A.M.'s mother.  The third party actually
approached the residence and acquired the child for visitation
with her natural father.
        Apparently A.M. had different names for the two father
figures in her life.  Frequently, Ricky Mingus was "Daddy" and
Richard Storch was "Daddy Bear."  On February 19, after he had
picked up his daughter, Ricky Mingus left the child in the care
of his girlfriend, Tina Cauldron, Tina's mother, and Tina's
grandmother.  Tina's mother later claimed that the child was

different this particular weekend.  The child allegedly had dark circles under her eyes and seemed "whiny."

Later, A.M. was taken to the home which Ricky Mingus shared with Tina in Sandusky, Ohio.  Tina subsequently claimed that she noticed A.M. was walking "funny."  When Tina asked A.M. if A.M. needed to go to the bathroom, A.M. responded that she "had a hurt."  Tina purportedly checked A.M.'s vaginal area.  Tina discovered toilet paper inside A.M.'s underpants and vaginal redness, so she gave A.M. a cornstarch bath.  After the bath, A.M. was still complaining of discomfort so Tina gave A.M. cream to soothe her.  A.M. reportedly responded that she was not afraid to apply the cream because A.M.'s mother also gave her cream to apply when she bled.

Tina then purportedly asked A.M. if anyone had touched her in the vaginal area and A.M. responded that "Daddy Bear" had.  After Ricky Mingus returned from the store where he had been during this encounter between his daughter and his girlfriend, Ricky Mingus and Tina took A.M. to a local hospital.

At the hospital, A.M. was examined the first of several times.  Seven G. Reineck, D.O., conducted the examination.  A.M. was not shy, timid or hesitant to display her vaginal area to Dr. Reineck.  Dr. Reineck later testified that, in his opinion, her lack of shyness and concern for privacy was indicative of sexual abuse.

Dr. Reineck conducted a thorough examination of the three-year-old's vaginal area.  He found her to be generally red, swollen and tender.

Dr. Reineck took the first of three measurements taken of the diameter of A.M.'s hymen.  The measurement he obtained was four and one-half to five millimeters, as opposed to what he considered the normal measurement of three millimeters for a three-year-old.  Dr. Reineck also asked A.M. if anyone had touched her where she hurt and she responded that "Papa Bear" had touched her there.

Following the examination, Erie County Children Services was contacted and the head of its child abuse investigation unit, one Willia Johnson, responded.  Johnson also interviewed A.M., and A.M. indicated that "Daddy Bear" had hurt her.  Johnson then permitted Ricky Mingus and Tina to take A.M. to their home.

Johnson next went to the home shared by A.M.'s mother, Patricia Woodruff, and Richard Storch to confront them with A.M.'s allegations.  Woodruff and Storch both vigorously denied that Storch had sexually abused A.M.  They angrily accused Ricky Mingus and Tina Cauldron's two sons, who were ages eight and eleven, of the abuse if abuse had in fact occurred.  Johnson then decided to have A.M. placed in a foster home.  A.M. ended up spending four months in foster care with families she did not know prior to placement.  After that, Erie County Children Services allowed the child to be placed with Patricia's brother.

Approximately two weeks after the visit to Dr. Reineck, A.M. was taken to the office of a pediatrician who was part of a state-funded task force specializing in child abuse cases.  The pediatrician asked A.M. questions and A.M. indicated that she had been touched in the area of her vagina by "Papa Bear."  The pediatrician examined A.M., measured her hymen, and took colposcopic pictures of the area near her vagina.  This pediatrician concluded that the hymen measured three to four

millimeters.

A.M. was examined by the same pediatrician on July 21, 1989, some five months after her first examination. The pediatrician again measured her hymen and indicated that it now measured eight to ten millimeters. More colposcopic pictures were taken, purportedly because the last set of photographs had not turned out. The pediatrician later testified at trial that he found evident trauma to the hymen as demonstrated by scarring and thickening at its edges. He felt that his findings were consistent with penile or projectile penetration and were indicative of sexual abuse.

Shortly after A.M.'s first complaints, Roy Prewitt, a lieutenant with the Sandusky Police Department, conducted a videotaped interview with A.M. The tape was marked as an exhibit at trial, but the prosecution never attempted to have the tape admitted into evidence. Lt. Prewitt asked A.M. why she had been to the hospital and A.M. responded that it was because her "boo boo" hurt. Lt. Prewitt then showed A.M. photographs of four of the significant males in her life. She pointed to the photograph of Richard Storch, indicating that he was the one who had hurt her. During part of the interview, she referred to her natural father as "Bear" and to Storch as "Pooh Bear."

Lt. Prewitt then provided A.M. an anatomically correct doll of a young girl and A.M. indicated on the doll where she hurt. He next asked A.M. to show on an anatomically correct male doll what part of the male had touched A.M. where she hurt. A.M. indicated the penis of the male doll.

Prewitt then presented A.M. with an anatomically correct picture of a young girl and asked A.M. to circle what parts of her had been touched by the male's penis. She circled the vaginal area, the chest area and the mouth. A.M. indicated that the man had put his penis in her mouth twice and her vagina twice.

Prewitt asked if Tina's children had ever touched A.M. where she hurt. A.M. initially replied in the negative and then indicated that the eleven-year-old had touched her in or on the buttocks. Later, A.M. indicated once again that "Daddy Bear" had hurt her.

Richard Storch was charged in the Court of Common Pleas of Erie County on two counts of forcible rape of a child under the age of thirteen, in violation of R.C. 2907.02. He also was charged with one count of gross sexual imposition, in violation of R.C. 2907.05. Each of the rape charges carried a required penalty that a convicted offender be "imprisoned for life." The gross sexual imposition charge carried a potential incarceration of one, one and one-half, or two years.

A.M. was not asked to testify at the trial. Instead, her various statements were admitted as evidence that she had been raped by Storch.

Willia Johnson testified at trial both during the state's case in chief and in rebuttal. In her testimony in the case in chief, she indicated that her qualifications consisted of some college courses, seminars she had attended on the subject of child abuse, and twelve years as an investigator employed by Erie County Children Services. She related statements given to her by A.M. She further was allowed to give expert testimony that A.M. was not able to testify in court primarily based upon a "visit" she had had with A.M. the week prior to trial. At the time of

the visit, A.M. was with her mother and was "preoccupied with her mother." A.M. chose not to respond to Johnson's questions, but instead preferred to play happily while basically ignoring Johnson. Johnson indicated that she had been informed by another investigator, her supervisee, of a similar encounter with the child.

A.M.'s mother also testified at trial. She indicated that A.M. had told her in February 1989 that Tina's children had had A.M. touch their genitals with her mouth. The mother claimed that she relayed the statement to the police and to the Erie County Children Services only to be met with a response that the eleven-year-old and eight-year-old did not know enough about sex to do something like that. The mother also testified about the occurrences in her household on the night before and day of February 19, 1989, which accounted for Storch's whereabouts. She indicated her belief that Storch was not capable of sexually abusing her daughter. She felt that he was a "father figure" to both her children and would not abuse them.

Storch testified on his own behalf that he had been more of a father to A.M. and her brother than Mingus had been. Storch testified as to his recollection of his activities on February 18 and 19. He firmly denied abusing A.M. He indicated that as a routine when A.M. and her brother returned from visitation, both children had marks on their bodies, which they attributed to harm inflicted by Tina's children.

The jury found Storch guilty on all counts and he was sentenced to consecutive life terms on the rape charges. He received a sentence of two years, incarceration on the gross sexual imposition charge, to be served concurrently with one of the life sentences.

Upon appeal, the court of appeals reversed the convictions based primarily upon a finding that an attempt should have been made by the trial court to determine whether A.M. could testify at trial before her various statements were admitted as proof that Storch had raped her. The appellate court noted that virtually no proof was placed before the jury indicating that Storch was guilty except for the statements of A.M. as related by third parties.

The appellate court specifically relied upon this court's opinion in State v. Boston (1989), 46 Ohio St.3d 108, 545 N.E. 2d 1220, in which we stated:

"Where a child is either available or unavailable and the child declarant's out-of-court statements meet the rationale and policy of a firmly rooted exception to the hearsay rule, such as Evid.R. 803(4), and it is demonstrated that a good-faith effort has been made to produce the non-testifying declarant, the out-of-court statements are admissible through a third person." Id. at 127, 545 N.E. 2d at 1238.

The cause is now before this court pursuant to the allowance of a motion for leave to appeal.

Kevin J. Baxter, Prosecuting Attorney, and Ronald R. Smith, Assistant Prosecuting Attorney, for appellant.

Dennis P. Levin, for appellee.

Jeffrey M. Welbaum, urging reversal for amicus curiae, Ohio Prosecuting Attorneys Association.

Tyack, J.    A very small child may not be competent to testify in open court.  If such a child is abused, the child may not be able to identify his or her attacker at a trial or to tell the trier of fact what happened.  Unless some other form of evidence can be presented, those who abuse small children will be at liberty to do so with utter impunity.  This need for admissible evidence to force those who abuse small children to face the legal consequences of the abuse pushes courts to liberalize the rules under which evidence is admitted.

Liberalizing the standards for admitting evidence in trials involving allegations of child abuse is not without its risks.  Not every child who says he or she has been abused has in fact been abused.  Sometimes a child can be a pawn in power games and rivalries between significant adults in the child's world.  Sometimes the adults are willing to believe the worst about their adult adversaries and encourage, consciously or subconsciously, stories of abuse when abuse has not occurred.  Sometimes the adults refuse to believe that someone they love could do such things to a child and divert the child's accusations toward someone they dislike.

The innocent desire of small children to please the adults they encounter makes the problem more complicated still.  The child may be guided less by objective standards of truth than by the desire to say what a significant adult wants to hear.  For the child, "truth" can be what pleases the adult.

Still, the fact is undeniable that child abuse, sexual and otherwise, does occur and is a monumental problem.  Some adults inflict incredible suffering on children for reasons that are difficult, if not impossible, for a healthy mind to fathom.  Those who cruelly abuse children need to be punished for their cruelty and prevented from continuing or repeating their abuse.  The innocent children need to be protected.

Perhaps the criminal justice system is not the best way to handle this important societal problem.  However, for the foreseeable future, the criminal justice system will be a part of American society's answer to the problem, if only because substantial terms of incarceration can protect children from pedophiles.

The burden then falls upon the courts to devise rules of evidence for child abuse cases which maximize the likelihood of convictions for the guilty and minimize the likelihood of convicting the innocent, protecting and helping those children who truly have been abused while detecting those children whose stories of abuse are not true or accurate.

Ohio has taken a significant step in bearing this burden through the adoption of Evid.R. 807.  The rule is set forth below in its entirety.1  The rule is a conscientious attempt to balance the competing interests and increase the likelihood of just results.

At the time of the trial of this case, Evid.R. 807 had not yet been adopted.  The appellate courts in all states were examining the complex issues and competing concerns presented by such cases and trying to provide guidance to the trial courts and the counsel who practice in them.  Despite the best efforts of the appellate courts, the guidance they provided was not always clear or clearly understood.  At the same time, the case law as to critical federal constitutional issues was in flux as the

personnel on the Supreme Court of the United States changed.

In the midst of this flux, we attempted to address the pertinent issues in our opinion in State v. Boston (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220.  Our opinion was meant to stand for far more than its simple syllabus, which reads:  "An expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant."

In Boston, we were well aware that we were presented with the kind of situation where special care must be taken to assure the accuracy of the fact-finding process.  The allegations of child abuse arose during a heated dispute over the allocation of parental rights and responsibilities -- a "custody fight" as it was more commonly known then.

In Boston, the child was brought to court and the trial judge conducted a private interview to ascertain whether the child was competent to testify.  The appellate opinions indicate that the trial court found the child to be "competent" in an intimate setting, but not "competent" to testify in a courtroom. Boston, 46 Ohio St.3d at 112, 545 N.E.2d at 1226.  The trial court's ruling in reality was a finding that the child was competent but unable, or unwilling, to speak about the critical issues in a courtroom setting.  We recommended in Boston that competency be redefined in situations where small children are asked to be witnesses, so that a child may make statements in open court without having to prove an appreciation of a formal oath or a detailed understanding of "truth."  We encouraged the admission of in-court statements by the child, with appropriate admonitions to the trier of fact as to how to weigh such "testimony."  Id. at 115, 545 N.E.2d at 1228-1229.

We also discussed several individual Rules of Evidence in the context of the facts, including Evid.R. 803(4), "Statements for Purposes of Medical Diagnosis or Treatment."  The opinion still has merit in its discussion of the Rules of Evidence to be applied by Ohio courts.

Boston included a discussion of the recent case law from the Supreme Court of the United States on the subject of the Sixth Amendment right to confrontation.  As will be discussed below, the Supreme Court of the United States has rendered subsequent opinions which appear to be partially at odds with what we considered the law of Sixth Amendment confrontation to be.

Therefore, we must address once again the delicate balance between our concern for the welfare of victims of child abuse and justice for those who are accused of such crime.  We must maintain that balance while honoring both the mandates of the Sixth Amendment to the Constitution of the United States and the mandates of our Ohio Constitution contained in Section 10, Article I.

The Sixth Amendment reads:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense."  (Emphasis added.)

Section 10, Article I of the Ohio Constitution is more

detailed in the rights it sets forth:

"***In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court. ***" (Emphasis added.)

For many years, the rights to confrontation set forth in the respective Constitutions were construed as being the same, in part because the right to confrontation in the Sixth Amendment was considered by the United States Supreme Court to require face-to-face confrontation in most circumstances. In the last thirteen years, the United States Supreme Court has drifted away from that requirement in a series of cases starting with Ohio v. Roberts (1980), 448 U.S. 56, 65 L.Ed 2d 597, 100 S.Ct. 2531. This drift is discussed at greater length in our recent opinion of State v. Dever (1992), 64 Ohio St.3d 401, 415-418, 596 N.E. 2d 436, 447-449, but part of the recent federal case law is particularly pertinent and will be restated here.

In Idaho v. Wright (1990), 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed 2d 638, the primary issue decided by the United States Supreme Court was described by Justice O'Connor as follows:

"This case requires us to decide whether the admission of trial of certain hearsay statements made by a child declarant to an examining pediatrician violates a defendant's rights under the Confrontation Clause of the Sixth Amendment." Id. at 808, 110 S.Ct. at 3143, 111 L.Ed. 2d at 648.
The Supreme Court of the United States then found that the statements did in fact violate the Confrontation Clause of the Sixth Amendment where the statements were not admitted pursuant to a "firmly rooted" hearsay exception and did not bear "'particularized guarantees of trustworthiness.'" Id. at 818, 110 S.Ct. at 3148, 111 L.Ed. 2d at 654. Even though the statements were a communication from a child to a physician, the trial court in Idaho had not admitted the statements as "statements for purposes of medical diagnosis or treatment" pursuant to Idaho's equivalent of our Evid.R. 803(4). Instead, the Idaho trial court admitted the statements under Idaho's Rule of Evidence 803(24), which read:

"'Rule 803. Hearsay exceptions; availability of declarant immaterial.--The following are not excluded by the hearsay rule, even though the declarant is available as a witness.

"'***

"'(24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the

proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.'" Id. at 812, 110 S.Ct. at 3144-3145, 111 L.Ed. 2d at 650.

Because the pediatrician in Idaho obtained the statements through the use of leading questions, such as "Does daddy touch you with his pee-pee?" and "Do you touch his pee-pee?", the Supreme Court of the United States found that the statements did not show "particularized guarantees of trustworthiness." The Supreme Court went on to state:

"We think the 'particularized guarantees of trustworthiness' required for admission under the Confrontation Clause must likewise be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief.

"***

"As our discussion above suggests, we are unpersuaded by the State's contention that evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears 'particularized guarantees of trustworthiness.' To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." Id. at 820-822, 110 S.Ct. at 3149-3150, 111 L.Ed. 2d at 655-657.

Following the decision in Idaho v. Wright, our Evid.R. 807 became effective. Evid.R. 807 accords with the Sixth Amendment right to confrontation and of the confrontation rights in Section 10, Article I of the Ohio Constitution. We believe that Evid.R. 807 is the best way to protect both sets of confrontation rights, especially those specifically set forth in the Ohio Constitution.

Approximately six months after Evid.R. 807 became effective, the Supreme Court of the United States decided White v. Illinois (1992), 502 U.S.     , 112 S.Ct. 736, 116 L.Ed. 2d 848. The opinion sets forth its central issue and conclusion as follows:

"In this case we consider whether the Confrontation Clause of the Sixth Amendment requires that, before a trial court admits testimony under the 'spontaneous declaration' and 'medical examination' exceptions to the hearsay rule, the prosecution must either produce the declarant at trial or the trial court must find that the declarant is unavailable. The Illinois Appellate Court concluded that such procedures are not constitutionally required. We agree with that conclusion." 112 S.Ct. at 739, 116 L.Ed. 2d at 854-855.

The abused child in White was known as "S.G." in the court records. The Supreme court opinion indicates:

"S.G. never testified at petitioner's trial. The State attempted on two occasions to call her as a witness but she apparently experienced emotional difficulty on being brought to the courtroom and in each instance left without testifying. *** The defense made no attempt to call S.G. as a witness and the trial court neither made, nor was it asked to make, a finding that S.G. was unavailable to testify." 112 S.Ct. at 739, 116 L.Ed. 2d at 855.

The Supreme Court of the United States thus took a case involving a small child who was unable to testify despite repeated attempts

to have her testify and used it as a vehicle to render an opinion which indicated that efforts to have a child testify live at trial were unnecessary in many situations.  The case could have held that where the state has made a good faith effort to make a child declarant available for live testimony at trial, but the child is emotionally or psychologically unable to testify, the child's hearsay statements may be admitted without violating the Sixth Amendment Confrontation Clause if a firmly rooted exception to the hearsay rule applies.  The Supreme Court chose to go well beyond that ruling in its opinion.

White has met with criticism because it limits the right to confrontation to situations in which the extrajudicial statements are not covered by well-established exceptions to the hearsay rule.2  If the statement falls within one of the well-established exceptions to the hearsay rule, no right to confrontation with the declarant exists, if White is to be read literally.  Although White acknowledges the extreme value of cross-examination to a reliable fact-finding process, the opinion states, as if it is obvious fact, that cross-examination would aid the process of arriving at the truth very little in those circumstances involving a well-established exception to the hearsay rule.  This statement is not obvious fact to many who have litigated such cases.

A common practice in prosecution of child abuse cases is to take the child to a medical practitioner, at least in part to obtain evidence for purposes of subsequent prosecution.  In certain circumstances, the interaction between the child and physician borders on detective-witness.  See, for instance, the facts in Idaho v. Wright, supra.

Cross-examination of a child making a statement to a physician could in fact enlighten the trier of fact in many circumstances.  A small child's statement to a physician previously unknown to the child is not automatically more reliable than the child's statement to any other stranger if the child is too young or otherwise unable to appreciate the benefits of telling the truth to assist the physician in diagnosis or treatment.  Knowing why the child made the statement and the circumstances surrounding the giving of the statement could be extremely important and would in most circumstances assist the trier of fact.

As noted above, the words of the White decision set forth a principle of law that goes well beyond the facts presented in the case.  We know that, as a lesser appellate court for purposes of federal questions, we ignore the words of the United States Supreme Court at our peril just as the "lesser" courts of Ohio ignore our words at their peril as to questions of state law.  Therefore, we must assume that the United States Supreme Court meant what it said in White, even though its current interpretation of the Sixth Amendment right to confrontation provides less protection for the accused than the protection provided by the Sixth Amendment as traditionally construed and by the express words of Section 10, Article I of the Ohio Constitution.

The potential applicability of the confrontation rights contained in the Ohio Constitution was not expressly before us in our recent case of State v. Dever, supra.  The addition of this issue alters the applicable law of confrontation.  In fact,

"[t]he admission into evidence of a hearsay statement pursuant to a firmly rooted hearsay exception does not violate a defendant's right of confrontation" under the Sixth Amendment as that federal right is defined by the United States Supreme Court. Dever, supra, at paragraph three of the syllabus. However, the admission may violate our state constitutional right of confrontation. The third paragraph of the syllabus in Dever should be construed to that effect.

The difference in construction would not have affected the outcome in the Dever case. The most damaging testimony in Dever came not from the abused child but from the neighbor who overheard the child being abused. The neighbor's testimony left little doubt as to what was occurring and who was abusing the child. See Dever, 64 Ohio St.3d at 401-402, 596 N.E. 2d at 438.

We believe the live testimony of a child who has claimed abuse will in most cases enhance the reliability of the fact-finding process. Videotaping or recording the interviews in which the out-of-court statements of the child are obtained would further enhance the integrity of the fact-finding proceeding. In many instances, Evid.R. 801(D)(1) or other Rules of Evidence would allow for the admission of the audio tapes or videotapes.3 If taping occurs and the tape is actually admitted into evidence, the trier of fact would have the benefit of the child's actual words and at least some insight as to the child's demeanor. The trial court also would have the benefit of the actual questions or conversation which led up to the child's indication that an individual had abused the child. Certainly the questions asked can be a significant factor in determining the reliability of the response, as the Supreme Court of the United States acknowledged in Idaho v. Wright. In that case the Supreme Court noted that leading questions could affect a small child's responses. Therefore, such questions tended to make the responses less reliable.

Our decision here does not represent the first time we have compared the provisions of the Ohio Constitution to analogous Amendments to the United States Constitution. Indeed, last year in State v. Brown (1992), 63 Ohio St.3d 349, 588 N.E.2d 113, we compared the protection afforded by Section 14, Article I of the Ohio Constitution with the protection provided by the Fourth Amendment to the United States Constitution as construed by the United States Supreme Court in New York v. Belton (1981), 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed 2d 786. We found the right to be free from unreasonable search and seizure guaranteed by the Ohio Constitution to be greater than that guaranteed by the Fourth Amendment, even though the words of the two provisions are very similar.

We note the requirement clearly set forth in Section 10, Article I, that an accused "meet the witnesses face to face." Section 10, Article I goes on to state:

"[B]ut provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court."

We do not construe this latter part of Section 10, Article I

to be the only alternative to in-court testimony but do consider it to mean that the circumstances under which extrajudicial statements can be admitted into evidence are few. Obviously, the framers of our state Constitution could not foresee all the alternatives that modern technology provides. We construe the right to confrontation contained in Section 10, Article I to require live testimony where reasonably possible. However, circumstances may exist where the evidence clearly indicates that a child may suffer significant emotional harm by being forced to testify in the actual presence of a person he or she is accusing of abuse. In such circumstances, the child may be considered unavailable for purposes of the Rules of Evidence and the out-of-court statements admitted without doing violence to Section 10, Article I, assuming Evid.R. 807 is otherwise satisfied. However, the presumption mandated by Section 10, Article I is that a child will be required in most circumstances to testify "face to face" with the individual being accused. This presumption is especially strong in cases where the trial court is on notice of situations which increase the risk that a child may be telling of abuse without the abuse having occurred, or when the child would be under significant pressure to name one party as opposed to another as the source of established abuse. Such situations include on-going domestic relations disputes (see, e.g., the facts in State v. Boston, supra) and extreme animosity between adults in households where a child spends significant periods of time.

We hold that the determination of a child declarant's availability is best made at a pretrial proceeding. Evid.R. 807 contemplates that a pretrial hearing will be conducted at which time the ability of the child to testify should be addressed and an initial determination as to the admissibility of the child's statements should be made. This would allow both parties to prepare for trial in accordance with the trial court's ruling. A pretrial hearing would also permit an interlocutory appeal if the trial court's ruling on the child's availability and/or the admissibility of the child's extrajudicial statements so hinders the state's evidence that the state cannot proceed with its case. See State v. Malinovsky (1991), 60 Ohio St.3d 20, 573 N.E.2d 22.

In the present case, the trial court did not provide to Storch that which Section 10, Article I and Evid.R. 807 require. No attempt was made to bring the child to court or to bring the court to the child to gain an unbiased view of whether the child was capable of testifying. The court instead relied upon the testimony of an investigator for Erie County Children Services who indicated that because the child did not interact readily with her and her supervisee and/or because the child lavished attention on her mother and ignored the investigators when in their presence, the child would not be able to express herself in a courtroom.

The child's reaction to the investigators is readily understandable. The child had been removed from her mother's home and placed in three different foster homes by the agency which the investigators represented. In fact, one of the investigators made the initial decision to have the child removed from her mother's home. Two of the three foster homes were the homes of persons who were total strangers to the child. The

child's mother, at least up to the time of trial, did not believe that her boyfriend, Storch, was the person who had abused the child and was frankly hostile to the investigators. Under the circumstances, the child's reticence to interact comfortably with the investigator while in her mother's presence should come as no surprise. The child's reaction to the investigators, however, did not enlighten the trial court as to whether or not the child was available to be a witness at trial.

Other practical reasons exist for trial courts to encourage children to provide live testimony. In some cases, a child, having once made a statement claiming that an individual has abused him or her, whether true or false, may not be readily permitted to withdraw the accusation. Indeed, some professionals who specialize in child abuse cases assume that attempts to retract an accusation are indicative that abuse has occurred. The trial may proceed with the trier of fact utterly unaware that a child has denied or retracted the accusation if no effort is made to have the child testify at trial. Instead, the trial of the case could go forward solely based upon statements made by the child months before the trial and months after the child has decided or stated that abuse did not occur.

The state of Ohio has suggested that Storch waived any defect in the proceedings because he did not subpoena the child to court himself. The applicable case law at the time of trial was State v. Boston, supra. Boston clearly placed the duty upon the state to establish the unavailability of a child declarant before the child's extrajudicial statements could be admitted into evidence. We are not prepared to find that Storch waived his state constitutional right to confrontation in failing to perform a duty we had expressly placed upon the state. Therefore, we do not accept the state's waiver argument.

In conclusion, we are not unmindful of the fact that a requirement that a child testify at trial is an additional stress upon a child whose mental and emotional health may be fragile already. We believe, however, that Evid.R. 807 provides the proper balance for the legitimate concerns of all whose interests the court must consider while still complying with the requirements of Section 10, Article I.

We therefore affirm the decision of the appellate court reversing the convictions. We remand the cause for further proceedings.

Judgment affirmed<br>and cause remanded

A.W. Sweeney, Douglas, Wright and Pfeifer, JJ., concur.

Moyer, C.J., and F.E. Sweeney, J., concur in the syllabus and judgment only.

G. Gary Tyack, J., of the Tenth Appellate District, sitting for Resnick, J.

FOOTNOTES

1    "Rule 807.  Hearsay Exceptions; Child Statements In Abuse Cases

"(A)  An out-of court statement made by a  child who is under twelve years of age at the time of trial or hearing describing any sexual act performed by, with, or on the child or describing any act of physical violence directed against the child is not excluded as hearsay under Evid. R. 802 if all of the following apply:

"(1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid.R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement, the mental state of the child, the child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In making this determination, the court shall not consider whether there is independent proof of the sexual act or act of physical violence.

"(2) The child's testimony is not reasonably obtainable by the proponent of the statement.

"(3) There is independent proof of the sexual act or act of physical violence.

"(4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statements that are claimed to indicate its trustworthiness.

"(B) The child's testimony is 'not reasonably obtainable by the proponent of the statement' under division (A)(2) of this rule only if one or more of the following apply:

"(1) The child refuses to testify concerning the subject matter or claims a lack of memory of the subject matter of the statement after a person trusted by the child, in the presence of the court, urges the child to both describe the acts described by the statement and to testify.

"(2) The court finds all of the following:

"(a) the child is absent from the trial or hearing;

"(b) the proponent of the statement has been unable to procure he child's attendance or testimony by process or other reasonable means despite a good faith effort to do so;

"(c) it is probable that the proponent would be unable to procure the child's testimony or attendance if the trial or hearing were delayed for a reasonable time.

"(3) The court finds both of the following:

"(a) the child is unable to testify at the trial or hearing because of death or then existing physical or mental illness or infirmity;

"(b) the illness or infirmity would not improve sufficiently to permit the child to testify if the trial or hearing were delayed for a reasonable time.

"The proponent of the statement has not established that the child's testimony or attendance is not reasonably obtainable if the child's refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of the statement for the purpose of preventing the child from attending or testifying.

"(C) The court shall make the findings required by this rule on the basis of a hearing conducted outside the presence of the jury and shall make findings of fact, on the record, as to the bases for its ruling."

2    See, for instance, Raeder, White's Effect on the Right to Confront One's Accuser, American Bar Association Criminal Justice (Winter 1993), Vol. 7, No. 4, at 2.

3    Evid.R. 801(D)(1) provides:

"(D) Statements Which Are Not Hearsay.  A statement is not hearsay if:

"(1) Prior Statement by Witness.  The declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is (a) inconsistent with his testimony, and was given under oath subject to cross-examination by the party against whom the statement is offered and subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (b) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, or (c) one of identification of a person soon after perceiving him, if the circumstances demonstrate the reliability of the prior identification."