OPINION AND JUDGMENT ENTRY
This is an appeal from a May 22, 1998 judgment of the Fulton County Court of Common Pleas in which the court accepted jury verdicts finding appellant, Floyd R. Slane, guilty of two counts of gross sexual imposition, one count of rape, and a specification that he compelled his victim to submit by force or threat of force; and from a September 28, 1998 judgment of the trial court sentencing appellant to life in prison without possibility of parole for the rape conviction, and to concurrent sentences of four years and three years for the gross sexual imposition convictions and in which the court ruled appellant must be classified a sexually violent predator.[1]
Appellant has presented three assignments of error for consideration on appeal that are:
"FIRST ASSIGNMENT OF ERROR
 The Trial Court violated Defendant/Appellant's rights of confrontation and cross examination of witnesses guaranteed through the Sixth and Fourteenth Amendments to the Constitution of the United States and through the Constitution of the State of Ohio, Article I, Section 10 as follows:
 "A. The court impermissibly and without justification halted the testimony of the minor [C.S.];
 "B. The court failed to follow the procedure and requirements mandated by Evidentiary Rule 807;
 "C. The Court erroneously allowed the introduction of testimony containing statements of the victim pursuant to Ohio Evidentiary Rule 803(4) when such statements were clearly not for the purposes of medical diagnosis or treatment; and
 "D. The Court erroneously allowed the introduction of testimony containing statements of the victim pursuant to Ohio Evidentiary Rule 803(2) when such statements were clearly not excited utterances.
"SECOND ASSIGNMENT OF ERROR
 The Trial Court committed prejudicial error by failing to grant Defendant's motion to allow Defendant's expert to interview the victim, [C.S.].
"THIRD ASSIGNMENT OF ERROR
 The Trial Court committed prejudicial error by failing to grant reasonable time to the Defendant and Defendant's counsel within which to prepare Defendant's defense."
The record shows that the grand jury sitting in Fulton County, Ohio, filed the indictment that started this case against appellant in the Fulton County Court of Common Pleas on January 22, 1998. The indictment charged appellant with two counts of gross sexual imposition and one count of rape. Each count had a specification that appellant is a sexually violent predator, and the rape charge had an additional specification that appellant compelled his victim to submit by force or threat of force.
Prior to trial, the court held a hearing to decide whether the boy who was the alleged victim of the gross sexual imposition and rape was competent to testify at trial. The court ruled that the boy, who was six years old when the crimes allegedly occurred, was a competent witness.
The case proceeded to trial, and the child was called to the stand. He began to testify on direct during the state's case. At the time of trial, he was eight years old. He testified that he was good friends with appellant's son, and that he spent the night at appellant's house "lots". He said the last time he spent the night at appellant's house was "March 3rd". His birthday is on "March 16th". He said he and appellant's son were sleeping in sleeping bags on the floor in the living room at appellant's home. He said they were watching television and they fell asleep. He testified that he was sleeping on his stomach.
He said appellant was sitting in a chair in the living room. He could not recall whether appellant was wearing clothes or a robe.
He said he was awakened because he felt something behind him. The transcript shows the following exchange took place between the child witness and the prosecutor:
"Q: Yes. And, [C.], what woke you up?
"A: Let's see —
"Q: [C.] do you remember what woke you up?
"A: I think Floyd.
 "Q: What? Floyd? What happened? [C.], did Floyd wake you up? Yea? How did he wake you up?
"A: I felt something.
 "Q: You felt something? Where did you feel something?
"A: Behind me.
"Q: Behind you? Do you know where behind you?
"A: It felt like something below my back.
 "Q: Oh, you felt something below your back? Okay. And what did you feel, [C.]?
"A. Something hard.
 "Q. Something hard? Did you find out what that was? And what was it?"
The trial judge then interrupted and said he wanted to see trial counsel at the bench. He announced he had something he needed to discuss with counsel and he recessed court.
The transcript contains the discussion between the court and counsel in chambers. The pertinent portions of the exchange were as follows:
 "THE COURT: All right. Let the record reflect that we are in chambers, outside the presence of the jury. And I should note that there was a request in court by the State to ask leading questions of [C.S.]. The Court granted that request pursuant to Evidence Rule 611. The Defendant did object to that Court's ruling. There were some leading questions asked of [C.]. It became very apparent that [C.] was having some real tough time answering some of the questions which dealt with the substantive matters of this case. I'm not sure frankly that [C.] is capable of proceeding to testify at this point. Mr. Duggan do you want to make any motions at this time?
 "MR. DUGGAN: Yea, I'd move for a dismissal, Your Honor.
 "THE COURT: Well, we're not going to do that but, Ms. Ahroni, what — what would you propose?"
The prosecutor asked for permission to let the boy testify while sitting on his father's lap. Appellant's counsel objected, arguing that the danger the father could send non-verbal signals to his son about the "right" answers to give was too great. The judge said:
 "I — I — I just can't — I think we're going to have to get that testimony in another way. I just don't feel comfortable allowing that to happen at this point. The jury has had an opportunity to see the boy's demeanor and how that impacts on the testimony of the other individuals who did hear his hearsay statements under 807, and I'm going to allow those individuals to testify as to his statements. But I think in fairness, I'm going to have to make that a ruling."
The court did make that ruling and the in-chambers meeting was concluded. The court then went back on the record in chambers, because the prosecutor made a motion that C. be given another opportunity to try testifying. She said:
 "[C.] indicated to me that he was too embarrassed to testify about the acts that occurred. The rest of his family is here in the courtroom, and I would again request that the Court give [C.] another opportunity to testify about the acts. And I believe that the fact that he was too embarrassed is definitely a good reason why he was reluctant to testify; it wasn't a lack of memory."
Appellant's trial counsel objected to any plan that would permit C.'s father to sit near him while he testified. Appellant's counsel said: "He's obviously embarrassed on the stand the first time; he's going to be embarrassed again."
The trial judge said that C.'s embarrassment was "pretty obvious to the jury as it was to me." He overruled the state's objections and said "it would be better to proceed under 807 with the other statements that he's made to these other witnesses." When the prosecutor reiterated her request for "just one more opportunity?" the trial judge answered:
 "No. I — I really feel it will be detrimental to the boy. I mean his — you got what you — you got the impression to the jury, and that went a long way for your case, but I think you're going to be able to get whatever you need in through other witnesses."
The transcript shows that the in-chambers meeting was resumed yet again. Appellant's trial counsel said:
 "Yea. I asked Orly who her next witnesses are and she indicated to me that it would be [C.S.'s parents]. And I suspect that she intends to attempt to admit the hearsay statements of the child through 807, and I want the record to reflect that that rule requires that at least ten days before the trial or hearing, a proponent of the statement provide to the other party or all other parties, in writing, the content of the statement, time and place in which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to have indicated its trustworthiness. And this is the first news I've ever had that they intend to come in and they intend to provide various hearsay statements, et cetera."
The prosecutor responded that she did not intend to admit the statements pursuant to Evid.R. 807, rather, she believed they were admissible as excited utterances under Evid.R. 803(2). Appellant's counsel objected, arguing that the since the child waited more than five months from the time of the alleged abuse until he made his statements and since the child had been interviewed about whether appellant had touched him by a social worker from Fulton County Children's Services and a police officer in uniform several months before he made his statements, the statements could not be considered excited utterances.
The trial court permitted the prosecutor to conduct a voir dire of C.S.'s father in chambers. At the close of the voir dire, the court ruled that, pursuant to Evid.R. 803(2), the father could testify about his child's out-of-court statements.
The trial then resumed. The trial court told the jury:
 "Members of the jury, it was the ruling of the Court that we would — it's just a little too difficult for [C.] to testify, so we're going to proceed with the State's case without [C.'s] testimony at this time."
The state then called six witnesses: C.S.'s parents, one of appellant's neighbors, a social worker and a doctor from the "Child Abuse Team" at the Medical College of Ohio("MCO"), and a male caseworker from Fulton County Children's Services ("children's services"). Five of the witnesses, C.S.'s parents, the social worker and the doctor from the child abuse team at MCO, and the male caseworker from children's services, testified that the child made out-of-court statements to them that appellant put his "Mr. Dinker" in the child's "butt", which was translated to appellant put his penis in the child's anus.
The parents testified that the child stayed at appellant's home on the evening before the child's seventh birthday, March 15, 1997. The mother admitted on cross-examination that her husband asked appellant if their son could stay at his home that evening so they could decorate their house for their son's birthday party the next day.
The mother testified that sometime around midnight, appellant brought her son home. He told her that her son kept asking for something to eat, and that he was not willing to fix food that late at night. He said her son would not quit crying, so he brought him home. The mother testified:
 "And my son ran to me and said his stomach hurt, and that he was afraid — I asked him what was wrong, and he said, `I was afraid you'd miss me.' And I started laughing; I go, `[C.], why was you afraid that I would miss you?' But he just kept insisting that he didn't want me to miss him and that his stomach hurt. And he told me he thought his stomach hurt because he was hungry."
She offered to fix her son something to eat, but he said no. She said: "At the time I thought maybe he was just excited because it was his birthday. Maybe he just wanted to come home to see how we had decorated the house for his party." She said her son "couldn't take his eyes off" appellant, and that appellant "was a mess". She thought appellant must have been upset with her son for "bugging him to get him something to eat" when they were trying to sleep.
The child's mother testified that the next day was uneventful, until "around eight o'clock that night, [the child] said that his stomach hurt really bad and that he couldn't go to the bathroom. It hurt when he went to the bathroom." She said she "checked him out" because "He has a habit of getting infections on his penis area, so that's what I thought." She said her child told her it was "his butt" that hurt. She checked it, and it was "raw." She said it looked like a friction burn. She said: "I grabbed — I turned [C.] around and I asked him, `[C.], did someone touch you?' And he wouldn't look at me. He just kept saying, `No, Mom, no.'" She said she kept trying to get him to look at her and to tell her if somebody had touched him there and he just kept saying no.
She had her husband look at their son, and said she wanted to take the child to the emergency room at the hospital to have a doctor look at him. The father thought it looked like the child was not wiping right. When the mother said she wanted to take the child to the hospital, the child began to cry and said he was just not wiping right and that he would start wiping. The mother testified she was afraid she was scaring the child, so she "just dropped it."
Sometime later, (the mother thought it was about two weeks later), the child started having trouble sleeping. The mother testified:
 "His bedtime is eight o'clock, and he would be up till three in the morning, playing in his room, talking, he — just messing around in his room. He would not go to — it's like he couldn't sleep. He was too wound up every single night. Then probably towards the end of May, he started sleeping — sneaking in his sister's room and sleeping on her floor. I would find him sleeping on my bedroom floor, sleeping underneath our beds or in the hallway outside our bedroom doors. And when I'd ask him what was wrong, why he would be sleeping under our things, all he would tell me was he was scared. He had a bad dream."
In May 1997, a female caseworker, accompanied by a female police officer in uniform, came to the child's home to interview him in his parent's living room.[2] They interviewed the child for a half-hour to forty-five minutes and showed the child pictures of naked people. They talked with him about good touches and bad touches and asked him if anyone had ever touched him. The child told them they were embarrassing him. The child told them appellant and appellant's son were his good friends.
After the interviewers left, the mother continued to talk with the child about the interview and told him he should not be afraid to talk. She asked him if appellant ever touched him and he said no. Several hours later (at 9:00 in the evening) the caseworker and police officer returned to the house to talk with the child in response to a call from the mother. The child still made no definitive allegations that appellant touched him.
The mother said that in the beginning of July, 1997, her daughter came downstairs crying hysterically. When she asked her daughter what was wrong, her daughter said her son had something to tell her about appellant. She said: "I had to coax him downstairs to come talk to me. And he — I asked him what happened, and he would whis — he would turn his back to me and tell his sister what happened and wanted his sister to tell me."
She said she took him to the police department, sometime around one-thirty in the morning. She said her son was reluctant to talk with the police officer at first, but after she told him he had nothing to be ashamed of, he told the officer that appellant "stuck his front private part in his back private part." She said the officer told her he did not have the training to pursue that kind of case and told her to contact children's services.
The child's father testified that he was at work when his wife called. He said that she told him their son had been molested and that he needed to come home right away. When he got home, he learned his wife had already taken their son to the police station to make a report. He said his wife was hysterical, and that he first worked to calm her down. Then he took his son out on the porch to talk.
The father testified about their conversation on the porch:
"Q: So what did you do at that point?
 "A: Well, I took him out onto the front porch, and we sat down on the front porch, just me and him. And I asked him what was going on then.
"Q: Now what was [C.'s] demeanor at the time?
 "A: He was crying, upset, real fidgety, flighty, didn't want to sit down really, acting real scared.
 "Q: And you said you had a conversation with [C.] then?
"A: Right.
 "Q: Okay. What — please tell us about the conversation.
 "A: Well, I basically asked him what was going on. I told him that Mom had called me home, and she was upset, and it had something to do with Floyd, and I asked him what was going on.
"Q: And what did [C.] say to you?
 "A: He said that Floyd had basically put Mr. Dinker in his butt, which he calls a penis Mr. Dinker."
 "Q: Okay. And what else did you ask [C.] when [C.] told you this?
 "A: I asked him why he hadn't told me this earlier, and he said that Floyd had said he was going to shoot him and me and my wife and daughter. And he went like that, and goes click, click. And I says, `That's what he did?' And he says, `Yea.' And he said he was scared. He didn't want to talk about it."
The mother and father both testified that their son was subsequently interviewed by several different individuals, including the female caseworker and female police officer who first talked to him in May, a sheriff's deputy, and a male caseworker from children's services. Some of the individuals interviewed him more than once.
A male caseworker from children's services testified that he interviewed the child in his office at the department of human services on July 25, 1997. Appellant objected to the testimony arguing that Evid.R. 807 procedures had not been followed and the witness should be barred from testifying. The court overruled the objection and permitted the male caseworker to testify.
The male caseworker said the child told him appellant was a friend who lived near his house. The caseworker testified:
 "He continued on telling me different things about Floyd. He said that he and Floyd worked together to raise money for Cedar Point by cleaning houses. He also stated that Floyd has a son named [S.] whom he was also friends with and played with. He stated that he would go over to Floyd's sometimes every day, and that he had stayed overnight a couple times; `Once or twice,' were his exact words."
The caseworker said that during an early part of the interview, the child said appellant had raped him. The caseworker asked what the child meant by "rape" and the child said that appellant "touched him on the privates."
The caseworker then gave the following testimony about the child's statements during the interview:
 "Q: Okay. And then what else did [C.] say regarding that?
 "A: He did go into some detail about that. He said that it happened a couple times. He stated that it happened when he went to the bathroom at Floyd's house, and that Floyd came into the bathroom when he was in there. And then he said Floyd went like this and he demonstrated physically —
"Q: How did he demonstrate it physically?
 "A: He put his — [C.] put his own hand on his genitals.
"Q: Okay. And then what else did [C.] tell you?
 "A: He stated that he told Floyd to stop, but Floyd did not say anything. He stated that his — [C.'s] pants were pulled down at the time, and specified that Floyd touched his privates on his skin and not over his clothes.
 "Q: Okay. And when you Floyd's, what part of Floyd's body touched [C.] on his privates?
 "A: I probably assumed that it was a hand. I don't think I specifically asked.
 "Q: Okay. And then did [C.] disclose another incident that happened to him with Floyd?
 "A: Yes, he did. Yes, he did. He stated that there was another time when he was sleeping at Floyd's house, and if felt like Floyd put his private part in his back.
 "Q: And did [C.] tell you anything else regarding that incident?
 "A: Yes. He stated that the incident happened when [C.] was in the living room, asleep on the floor. He said he was laying on his belly in front of the T.V. He also said that Floyd was sitting in a chair in the living room at the time, and that Floyd came over to him and pulled his pants down and he demonstrated this again by pointing to his thighs. He then stated that Floyd put his front private part into his — [C.'s] back private part, and he demonstrated this by pointing to his buttocks. He — [C.] stated that Floyd's private part went inside him, that it felt very uncomfortable, that it hurt and it made him cry. He said that this happened for just a minute, and he said that Floyd just put it there, that it did not go in and out. He stated that Floyd stopped on his own.
"Q: And what else did [C.] tell you?
"A: About this incident?
"Q: Yes.
 "A: Okay. He stated that Floyd's private part was hard, and I questioned him further to tell me what that means, what does he mean by `hard,' and he couldn't tell me exactly what he meant by that. And [C.] stated that after that point, he got up and pulled his own pants up and told Floyd to quit or that he would tell. He stated that Floyd threatened him then by pulling his gun and holding it to his stomach. And [C.] demonstrated this by pointing to the center of his belly, which is where — I guess he was indicating where the gun was pointed. He stated that Floyd also threatened him saying when he gets out of jail, he will kill him and his family. And he described the gun as a long gun with two bullet things. [C.] stated that he did not actually see Floyd's front private part. He said that when he got up, Floyd's pants were a little bit down, but his private part could not be seen. [C.] went on to state that after Floyd threatened him, he put his gun away. And [C.] stated that he then asked Floyd to take him home, and he did. [C.] stated that this happened the day before his birthday in the morning after he stayed overnight at Floyd's house, and he also said that —
 "Q: Well, did he say anything regarding [S.], Floyd's son?
 "A: Yes. He said he was sleeping in the living room in a sleeping bag, but that he did not see what happened.
 "Q: And did he tell you why [S.] did not see what happened?
"A: Just that he was sleeping.
"Q: Okay. And did [C.] tell you anything else?
 "A: Yes. He said that there were no other times than these incidents that he'd already talked about when Floyd made him feel uncomfortable in any way. He also said that no one else has made him feel uncomfortable in any way. He said that his mom asked him if this had happened, and he at first denied it. Then he told his sister all about it, and that he later on did tell his mom what happened, but that he didn't tell her at first because he was afraid of losing all of his friends. And he stated that after he told his mom, she then took him to see Officer Copeland."
The caseworker said that C. was "easy to talk to" and was "immediately verbal". He said C. "was very willing to talk about everything."
The social worker and the doctor from the "Child Abuse Team" at MCO testified that they saw C. on August 27, 1997, after he was referred to their program by children's services. The social worker testified that it is her function on the team to take referrals from case workers, schedule appointments, take a medical history from the child or from whoever brought the child, and to "prepare them for the medical exam." She said that she asked C. if he knew why he was there, and he said because the doctor wanted to see him. When she asked if he knew why the doctor wanted to see him, he said "Because of Floyd" and then he gave an explanation. The social worker testified that C. told her:
 "that the alleged perpetrator, `is named Floyd, and he's my best friend's father.' He told me that Floyd told him,`If you tell anyone when I get out of jail, I'll kill you and your family.' And he told me that `Floyd did something one time.' And he didn't want to talk about it because he just wanted to forget about it all."
She then took a health history and a school history from C., explained the exam to him and had him change into a gown. She stayed with C. while the doctor did the exam.
The doctor testified that he did a complete exam of C. He testified: "this is a medical evaluation that is being carried out with a definite focus, though, on finding if there are physical findings that may relate themselves to child molestation." He said that the results of the exam were "a shade less than what I would call screaming normal * * * [b]ut not what I would call abnormal." He said he could not see anything that would indicate "trauma to the area." He explained that the anus is capable of stretching quite far and that it is possible for an anus to be penetrated by a penis without leaving "physical findings." He also said that even if there was some physical evidence, the anus heals quickly, and the physical evidence could be gone within a week. He said that eighty percent of children who report anal sexual abuse have no physical findings to verify their allegations.
He was asked if he interviewed C. and he answered:
 "We typically don't interview to any great extent. Part of that is, we feel that's the job of the case worker. We know that children shouldn't be over-interviewed, because it can destroy what information has been provided. So we make an effort to stay away from that. But every now and then, there will be statements made. We take them down when we happen to hear them."
He initially testified that C. did not make any statements to him, and that if C. had told him any statements they would have been included in his report in quotes.
The state later recalled the doctor to the stand, and he changed his testimony that he had not interviewed the child. He explained that: "In reviewing the crude notes that we use and that we accumulate, it became apparent to me that I had indeed asked [C.] some very direct questions following his examination." He testified:
 "The particular incident took place because * * * our social worker, contacted — came to me after the examination, after I had initially left the room, and indicated to me that [C.] was willing to talk to me by myself, as a physician, and presumably as a male, with nobody else in the room. Most of our assistants are female. Occasionally we will have medical students and nursing students with us as a result of — because we are of course a teaching institution. But he made the stipulation that he would be willing to talk with me alone. And this was done in the context of one of these brief interviews. The first question I usually ask is a fairly direct one, and not at all what you would call a — your usual forensic interview, but it's either with a marker of some sort at the point of concern, be it the vestibule or entroitus of the child — of female vagina, or in this particular instance, at the anus of the child. And by marking it either by a finger or a Q-tip, and I don't — I suspect it would probably have been a finger or possibly by defining the area as the place that the poop comes out, which most children can identify with and they know where that is, and I asked the question: Has somebody besides myself touched you there, since I have touched the child in that area as part of my examination. The touch is just — during the examination is just a superficial touch, and moving the buttocks to either side to be able to examine the periphery of the anus. It is not a rectal examination, such as an adult might get in an adult physical with an actual intrusion of the finger into the — through the anus and into the rectum, but simply marking the area. And he was asked: `Has somebody besides myself touched you there?' And the answer may be yes or it may be no. Occasionally it's an,`I don't know.' But in this particular instance, it was a yes. My next question would then be: `With what?' This is where the response was, `His dinker,' and where the quotation marks in the original, or in my typed report, came from. I then followed that question with: `Who was it?' He responded, `Floyd.' He then, let's see, I then asked: `How many times did this happen?' and he responded, `One time.' And following that, I then tried to define, and again this would go for either sex, depending on the area we're looking at, whether there had been any intrusion beyond just simply touching at the anus or actual intrusion beyond the anus and into the rectum, in this instance, or into the vagina in a female. At this particular instance, the response was, `It didn't go all the way in. It didn't go further in where the poop was.' The — there were then questions asked about any threats, and this is the source of the answer about killing himself and the family if he told anybody. My deviation from my norm is that in recording this in the chart, I can't explain why it happened; I recorded this as in a narrative form, the last three sentences of the second paragraph as opposed to the usual question followed by a quoted answer, and I can't give you an explanation as to why this difference took place."
Both the doctor and the social worker from MCO testified that they did not know how many times C. was interviewed before they saw him. The doctor testified that a child who is interviewed four or five times is over-interviewed, and that if a child is interviewed ten to fifteen times, that is "grotesque." He said it was "bothersome" that testimony in the case showed that C. was interviewed eight to twelve times before he saw C., but said it would not change his findings.
Appellant's neighbor who was called by the state testified that he had seen a long-barreled shotgun and some old muskets locked up in a gun cabinet. He said the gun cabinet was in the living room at appellant's home. He said appellant had the guns on March 15, 1997, the date C. alleged appellant molested him and threatened him with a shotgun.
Appellant presented two witnesses on his behalf. The first witness was the police sergeant from the Wauseon Police Department who spoke with C. at 1:30 in the morning when C.'s mother took him to the police station. The second witness was a clinical psychologist who is a specialist in the diagnosis and treatment of child sex abuse.
The police sergeant testified:
 "Basically this woman brought this little boy in, identified herself. We went back in the office. She at that time told me she had a case with, I thought she said she had a pending case already there at — Complaint filed with Officer Scherer. She met with her. And at that time, she stated that her son wouldn't talk to a female officer about apparently there was an assault, sexual assault, that took place. And she stated that he would talk to the male officer. So at that time, I looked at the boy and I said, `What do you want to say?', or something to that nature. I can't remember word for word verbatim. And he appeared to be real scared and wouldn't really talk to me too much. The mother at that time told him `Go ahead and tell the officer. Go ahead and tell the officer everything's okay.' And the boy was scared. And I can remember him pointing down, but can't remember if he said anything or not. At that time, I asked her if — I stopped it when I found out where she was going with it, because our protocol is to pass it on to Children's Services. I don't have the training to interview a child in a sexual assault case as far as explaining the anatomy and so forth. And what we usually do is make sure we get Children's Services involved in the interview so it's properly done. And I proceeded to tell the mother that she needed to follow up with Officer Scherer because apparently she had cases reference the same person that she was saying — the mother was saying was the assailant. And I also told her we were going to have to make contact with Children's Services for this interview. And that's pretty much what I remember of it."
The clinical psychologist testified that there are protocols recognized by various psychiatric societies that are established to help prevent false allegations of child molestation. He testified: "in general the accepted practices for sex abuse evaluations involve using a trained objective evaluator; tape recording or video taping all contacts with the child; being clear about the source, substance and kinds of statements the child makes before they get to an evaluator; following a pattern of interview in — and questioning that is open, not leading, does not have a bias inherent in it, doesn't make suggestions to the child, and tests for whether or not there are alternate explanations for the things the child says."
The clinical psychologist testified that experts in his field had come to realize that early interviews of young children who may have been victims of sex abuse must be carefully conducted because young children are suggestible. If an adult interviewer, with good or bad intentions, portrays to a child through voice tone or inflection, form of questions, repeated questions, etc. that the adult is not happy with the answers given by the child, the child will usually change his or her story to fit what the child thinks the adult wants to hear. When presented with a hypothetical question that sets forth the facts of how the events unfolded in this case, the clinical psychologist testified that the possibilities that some kind of bias or suggestibility was in effect were "significantly higher". When asked if there were certain behavioral markers that would show a child had been molested, the clinical psychologist said no. He explained that many of the markers cited, such as trouble sleeping, can occur for many reasons other than sexual abuse, and there is no set of particular behaviors that can be attributed solely to a child being molested.
On cross-examination, the clinical psychologist admitted he did not know whether C. was asked open-ended or leading questions by his various interviewers. He said he was unable to review the way the interviews were done because none of them were audio or video taped. He said that many of the children's services agencies in Ohio had no policy to audio or video tape their interviews with children who may have been sexually molested. He said the only reason he could think of for not at least audio taping the interviews was to ensure that no one could review the methods that were used in the interview.
At the close of the clinical psychologist's testimony, the defense rested.
Appellant argues in support of his first assignment of error that several rulings of the trial court violated his constitutional rights to confrontation and cross-examination of witnesses. He points first to the trial court's ruling removing C. from the stand during the state's direct examination of the child, thereby depriving him of any right to cross-examine the child. He next points to the trial court's rulings permitting several other witnesses to repeat out-of-court statements made by the child pursuant to Evid.R. 807, Evid.R. 803(2), or Evid.R. 803(4). He says the testimony admitted pursuant to these exceptions to the hearsay rule was wrongly admitted because the exceptions did not apply in this case. Finally, he says that even if the exceptions did apply, he was still denied his right, guaranteed by the Ohio constitution, to a face-to-face confrontation with his accuser.
Appellee argues that appellant waived any argument related to the violation of his right to confrontation because he did not raise the argument at trial. Furthermore, appellee says that even if appellant's argument was preserved for appeal, most of the evidence was admitted pursuant to firmly rooted hearsay exceptions and appellant's right to confrontation of witnesses was not violated. Appellee does note that the testimony of the male caseworker from children's services was admitted pursuant to Evid.R. 807 and concedes "that a hearing pursuant to Evid.R. 807 should have been conducted prior to his testimony, since his testimony does not fall under any other firmly rooted exceptions to the hearsay rule."
First, we do not agree that appellant waived his argument that his right to confrontation was violated by the rulings of the trial court in this case. When the court first removed C. from the stand, appellant moved for a mistrial. When his motion was denied, he continuously objected to the introduction of the child's out-of-court statements through other witnesses, arguing that none of the statements fell under hearsay exceptions. Appellant clearly challenged the introduction of the out-of-court statements of the child and clearly objected to the introduction of hearsay, which is generally prohibited for the precise reason that an accused cannot confront the proponent of the out-of-court statement.
Second, we agree with appellant that the trial court did not properly apply Evid.R. 807 in this case. Evid.R. 807 provides:
 "(A) An out-of-court statement made by a child who is under twelve years of age at the time of trial or hearing describing any sexual act performed by, with, or on the child or describing any act of physical violence directed against the child is not excluded as hearsay under Evid.R. 802 if all of the following apply:
 "(1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid.R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement, the mental state of the child, the child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In making this determination, the court shall not consider whether there is independent proof of the sexual act or act of physical violence.
 "(2) The child's testimony is not reasonably obtainable by the proponent of the statement.
 "(3) There is independent proof of the sexual act or act of physical violence.
 "(4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.
 "(B) The child's testimony is `not reasonably obtainable by the proponent of the statement' under division (A)(2) of this rule only if one or more of the following apply:
 "(1) The child refuses to testify concerning the subject matter of the statement or claims a lack of memory of the subject matter of the statement after a person trusted by the child, in the presence of the court, urges the child to both describe the acts described by the statement and to testify.
"(2) The court finds all of the following:
"(a) The child is absent from the trial or hearing;
 "(b) The proponent of the statement has been unable to procure the child's attendance or testimony by process or other reasonable means despite a good faith effort to do so;
 "(c) It is probable that the proponent would be unable to procure the child's testimony or attendance if the trial or hearing were delayed for a reasonable time.
"(3) The court finds both of the following:
 "(a) The child is unable to testify at the trial or hearing because of death or then existing physical or mental illness or infirmity;
 "(b) The illness or infirmity would not improve sufficiently to permit the child to testify if the trial or hearing were delayed for a reasonable time.
 "The proponent of the statement has not established that the child's testimony or attendance is not reasonably obtainable if the child's refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of the statement for the purpose of preventing the child from attending or testifying.
 "(C) The court shall make the findings required by this rule on the basis of a hearing conducted outside the presence of the jury and shall make findings of fact, on the record, as to the bases for its ruling."
Evid.R. 807(C) clearly requires the trial court to: 1) hold a hearing outside the presence of the jury; and 2) make findings of fact on the record explaining the basis of its ruling. The Supreme Court of Ohio has ruled: "Evid.R. 807 contemplates that a pretrial hearing will be conducted at which time the ability of the child to testify should be addressed and an initial determination as to the admissibility of the child's statements should be made." State v. Storch (1993), 66 Ohio St.3d 280, paragraph two of the syllabus.
The trial court did not hold any hearing outside the presence of the jury before it ruled the child was unavailable to testify in this case. Accordingly, the trial court did not appropriately consider the four factors that must be shown before a child's statements are admissible pursuant to Evid.R. 807: "(1) the statement must be trustworthy, (2) the child's testimony must be unavailable, (3) independent proof of the act must exist, and (4) the proponent must notify all other parties ten days before trial that such a statement will be offered in evidence." Evid.R. 807 Staff Note (July 1, 1991 Amendment).
The state concedes that the fourth factor was not complied with in regard to all of the witnesses it presented at trial. In addition, based upon the testimony that was provided at trial, it appears that the third factor, independent proof of the act, could also be missing in this case. See State v. Black
(1993), 87 Ohio App.3d 724, 729-730.
Furthermore, Evid.R. 807(B) specifies the criteria that must be shown before a trial court can rule that a child's testimony is not reasonably obtainable by the state. The criteria are: 1) the child refuses to testify about the subject or claims a lack of memory even after the child is urged, in court, to testify by a person the child trusts; or 2) the child is not present, the party seeking to admit the child's statements is not able to "procure the child's attendance" through good effort or process, and a reasonable delay of the trial would not help the party to produce the child; or 3) the child cannot testify at trial because of a mental or physical illness or infirmity that exists at the time of trial and a reasonable delay of the trial would not sufficiently allow the child's illness or infirmity to improve to the point that the child could testify.
The trial court's reason for removing the child from the stand, that the child was too embarrassed to continue testifying, does not meet any of the criteria in Evid.R. 807 that are a basis for finding a child's testimony is not reasonably obtainable. Rather than remove the child from the stand, the trial court should have considered reasonable alternatives to help ease the discomfort of the child witness that are specifically endorsed in the staff notes accompanying Evid.R. 807, such as permitting the child to testify by closed circuit television. In this way, the needs of the child would be met while appellant's right to confrontation would be preserved.
Without question, then, the trial court failed to properly apply Evid.R. 807 in this case. The testimony of one state witness, the male caseworker from children's services, should not have been admitted at trial without a pre-trial Evid.R. 807 hearing.
Appellee argues, however, that even if the male caseworker should not have been permitted to repeat the statements [C.] made to him, the testimony of all the other state witnesses was admissible pursuant to other evidence rules, and appellant was therefore not prejudiced by the testimony of the male caseworker. Appellee also argues that if the testimony of the other witnesses was admissible pursuant to other established rules of evidence, the trial court was not required to hold an Evid.R. 807 hearing for those witnesses. Finally, appellee says that because the testimony of the other witnesses was admissible pursuant to well-established exceptions to the hearsay rule, appellant's right to confrontation was not violated.
Appellee argues that C.'s parents were permitted to repeat the out-of-court statements their son made to them because the statements were excited utterances and were therefore admissible pursuant to Evid.R. 803(2). Appellee acknowledges that the statements were made several months after the alleged molestation of C. by appellant actually occurred, but says Ohio courts have "liberally applied" the test for an excited utterance in cases involving children who were victims of sexual abuse. Appellee says Ohio courts have ruled that the time between an event and a child's statement is not dispositive of the question of whether a statement is an excited utterance. Appellee also says that Ohio courts have repeatedly noted that children are less capable of reflective thought than adults.
The Supreme Court of Ohio has acknowledged a liberalized approach to applying the requirements for an excited utterance to statements made by children about sexual abuse.
State v. Taylor (1993), 66 Ohio St.3d 295, 304. The State v.Taylor court said that the reason behind allowing "admission of those statements even when made after a substantial lapse of time" was the court's recognition that children "remain in a state of nervous excitement longer than would an adult" and of the "limited reflective powers" of children. Id. at 304. However, the Supreme Court of Ohio also noted that "a variety of factors may be involved in determining the trustworthiness of an excited utterance" and stated that a trial court's decision to admit a statement as an excited utterance should be reversed only if the decision is not a reasonable one. Id. at 304-305.
In this case, after carefully considering the totality of the circumstances surrounding the statements C. made to his parents, we conclude that the trial court's decision to admit C.'s statements as excited utterances was not reasonable. The record shows that the statements were made in July 1997, many months after the alleged incident of molestation of C. by appellant took place in March 1997. In the time between that alleged incident and the time C. made his statements to his parents, C. was shown pictures of naked individuals, was told about good touches and bad touches, was directly asked by a caseworker, a uniformed police officer and his mother if appellant had ever touched him. The evidence in this case is insufficient to show that C. was under the stress of a startling occurrence when he made the out-of-court statements his parents were permitted to repeat in court.
Appellee next argues that the trial court did not err when it admitted statements C. made to the social worker and the doctor from the Child Abuse Team at MCO pursuant to Evid.R. 803(4). Appellee says C. made statements identifying appellant as the person who molested him during a medical examination that was done for the purpose of diagnosis and treatment, so the statements are admissible under Evid.R. 803(4). Finally, appellee argues that the trial court's failure to conduct a voir dire of the doctor and social worker to consider whether they could repeat C.'s statements to them pursuant to Evid.R. 803(4) was not plain error.
The Supreme Court of Ohio has ruled that:
 "Statements made by a child during a medical examination identifying the perpetrator of sexual abuse, if made for purpose of diagnosis and treatment, are admissible pursuant to Evid.R. 803(4), when such statements are made for the purposes enumerated in that rule." State v. Dever
(1992), 64 Ohio St.3d 401, paragraph two of the syllabus.
In reaching that ruling, the State v. Dever court noted that historically, the only basis for the medical treatment or diagnosis exception to the hearsay rule was a patient's motivation to tell the truth to a treating doctor, so that the doctor would make an accurate diagnosis or render effective treatment. However, the State v. Dever court said the "focus must be slightly different when a child is involved." Id. at 410. The court explained:
 "The trial court should consider the circumstances surrounding the making of the hearsay statement. If the trial court finds in voir dire that the child's statements were inappropriately influenced by another, then those statements would not have been made for the purpose of diagnosis or treatment. This inquiry will vary, depending on the facts of each case. For example, the trial court may consider whether the child's statement was in response to a suggestive or leading question (as was the case in Idaho v. Wright), and any other factor which would affect the reliability of the statements (such as the bitter custody battle in State v. Boston). If no such factors exist, then the evidence should be admitted. The credibility of the statements would then be for the jury to evaluate in its role as fact finder. In addition, the witness whose testimony brings in the child's hearsay statement can be cross-examined about the circumstances surrounding the making of the statement. But if the trial court discerns the existence of sufficient factors indicating that the child's statements were not made for the purpose of diagnosis or treatment, the statements must be excluded as not falling within Evid.R. 803(4)." Id. at 410-411.
Appellee says the above quoted language from State v.Dever is dicta, and that the trial court did not commit prejudicial error when it did not conduct a voir dire before it allowed the social worker and the doctor from MCO to repeat statements C. made to them and admitted that testimony pursuant to Evid.R. 803(4). Appellee cites to several cases, including one from this court, in which the courts ruled that no prejudicial error occurred when a trial court admitted testimony pursuant to Evid.R. 803(4) without first conducting a voir dire. An examination of the cited cases shows that in each one, the child making the allegations of sexual abuse testified at trial and was subject to cross examination. For that reason, the courts concluded that the accused's right to confrontation was not violated and no prejudice accrued from the failure of the trial courts to hold a voir dire before admitting statements pursuant to Evid.R. 803(4) that the child made to medical care givers. See, e.g., State v. Kelly (1994), 93 Ohio App.3d 257,264; State v. Crum (Oct. 26, 1998), Stark App. No. 97-CA-0134, unreported; State v. Demiduk (June 24, 1998), Columbiana App. No. 96-CO-16, unreported; State v. Lugli (Aug. 30, 1998), Erie App. No. E-95-025, unreported; and State v. Holland (July 18, 1994), Stark App. No. CA 9496, unreported.
We find it significant that after the Supreme Court of Ohio decided State v. Dever, 64 Ohio St.3d 401, it considered a case in which a child's statements were introduced at trial through the excited utterance and the medical examination exceptions to the hearsay rule without any attempt to have the child testify at trial. State v. Storch (1993), 66 Ohio St.3d 280,283. The Supreme Court of Ohio reversed the conviction of the accused molester in that case. The court said that when it decided State v. Dever the question of "confrontation rights contained in the Ohio Constitution was not expressly before [the court] * * *." Id. at 291. The court said:
 "The addition of this issue alters the applicable law of confrontation. In fact, `[the] admission into evidence of a hearsay statement pursuant to a firmly rooted hearsay exception does not violate a defendant's right of confrontation' under the Sixth Amendment as that federal right is defined by the United States Supreme Court. Dever, supra, at paragraph three of the syllabus. However, the admission may violate our state constitutional right of confrontation. The third paragraph of the syllabus in Dever should be construed to that effect." Id.
The State v. Storch court then noted that its ruling would not have changed the outcome in State v. Dever. The Statev. Storch court explained: "The most damaging testimony in Dever
came not from the abused child but from the neighbor who overheard the child being abused. The neighbor's testimony left little doubt as to what was occurring and who was abusing the child." Id.
The State v. Storch court explained that it was now ruling that an accused's right to confrontation under the state constitution may be violated if a child's out-of-court statements are admitted pursuant to hearsay exceptions without first making a determination that the child is unavailable pursuant to Evid.R. 807. The court said:
 "We believe the live testimony of a child who has claimed abuse will in most cases enhance the reliability of the fact-finding process. Videotaping or recording the interviews in which the out-of-court statements of the child are obtained would further enhance the integrity of the fact-finding proceeding. In many instances, Evid.R. 801(D)(1) or other Rules of Evidence would allow for the admission of the audio tapes or videotapes. If taping occurs and the tape is actually admitted into evidence, the trier of fact would have the benefit of the child's actual words and at least some insight as to the child's demeanor. The trial court would also have the benefit of the actual questions or conversation which led up to the child's indication that an individual had abused the child. Certainly the questions asked can be a significant factor in determining the reliability of the response, as the Supreme Court of the United States acknowledged in Idaho v. Wright. In that case the Supreme Court noted that leading questions could affect a small child's responses. Therefore, such questions tended to make the responses less reliable."
The court noted that the face-to-face confrontation requirement of the constitution of the state of Ohio has some flexibility, such as taking an out-of-court deposition of the declarant to be admitted at trial. The court then said:
 "We construe the right to confrontation contained in Section 10, Article I to require live testimony where reasonably possible. However, circumstances may exist where the evidence clearly indicates that a child may suffer significant emotional harm by being forced to testify in the actual presence of a person he or she is accusing of abuse. In such circumstances, the child may be considered unavailable for purposes of the Rules of Evidence and the out-of-court statements admitted without doing violence to Section 10, Article I, assuming Evid.R. 807 is otherwise satisfied. However, the presumption mandated by Section 10, Article I is that a child will be required in most circumstances to testify `face to face' with the individual being accused. This presumption is especially strong in cases where the trial court is on notice of situations which increase the risk that a child may be telling of abuse without the abuse having occurred, or when the child would be under significant pressure to name one party as opposed to another as the source of established abuse. Such situations include on-going domestic relations disputes (see, e.g., the facts in State v. Boston, supra) and extreme animosity between adults in households where a child spends significant periods of time.
 "We hold that the determination of a child declarant's availability is best made at a pretrial proceeding. Evid.R. 807 contemplates that a pretrial hearing will be conducted at which time the ability of the child to testify should be addressed and an initial determination as to the admissibility of the child's statements should be made. This would allow both parties to prepare for trial in accordance with the trial court's ruling. A pretrial hearing would also permit an interlocutory appeal if the trial court's ruling on the child's availability and/or the admissibility of the child's extrajudicial statements so hinders the state's evidence that the state cannot proceed with its case." Id. at 293.
We believe that the rulings of the Supreme Court of Ohio in State v. Dever, 64 Ohio St.3d 401, and in State v.Storch, 66 Ohio St.3d 280, show that the court expects trial courts to conduct pre-trial hearings before admitting any testimony regarding statements of a child accusing someone of sexually abusing the child. The pre-trial hearings should be held to determine: 1) if a child is competent and able to testify or if the child is unavailable as defined by the requirements in Evid.R. 807; and 2) whether under the totality of the circumstances in the particular case under consideration, the out-of-court statements of a child to a medical care giver have sufficient reliability to be admitted pursuant to Evid.R. 803(4). In regard to the second issue, it is not enough for the court to hear from the care giver that the purpose of the examination was medical treatment or diagnosis. Rather, the court must consider the circumstances the child has been subjected to prior to the examination (i.e. a bitter custody dispute, repeated interviews of the child by others, whether the child has been asked leading questions, etc.) and should consider how the statements came about during the examination (were they the result of leading questions, spontaneous, etc.) See State v. Storch, 66 Ohio St.3d 280, 291.
This is not a case where either requirement was met. Furthermore, this is not a case where the error was harmless because appellant was able to cross-examine his child accuser.
Indeed, in this case, the child did begin to testify, but did not complete his testimony and was never subject to cross-examination. The trial judge specifically noted that the testimony given by the child helped appellee because it permitted the jury to see the child's demeanor and "how that impacts on the testimony of the other individuals who did hear his hearsay statements under 807 * * *." Accordingly, we cannot conclude that appellant's right to confrontation found in the constitution for the state of Ohio was not violated in this case or that the trial court's failure to hold a voir dire before admitting the statements of the social worker and the doctor from MCO pursuant to Evid.R. 803(4) was not prejudicial.[3]
Appellant's first assignment of error is well-taken. Because his right to confrontation under the constitution of the state of Ohio was violated, appellant's conviction is reversed, and this case is remanded for a new trial.
Our disposition of the first assignment of error renders appellant's second and third assignments of error moot.
The judgment of the Fulton County Court of Common Pleas is reversed, and this case is remanded for further proceedings consistent with this opinion. Appellee is ordered to pay the court costs of this appeal.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, P.J.
 Richard W. Knepper, J.
 Mark L. Pietrykowski, J.
CONCUR.
[1] The trial court ruled on three specifications that were reserved for the court, rather than presented to the jury, and found appellant guilty of three specifications that he was a sexually violent predator.
[2] The record shows that this interview was conducted after allegations were made that appellant sexually assaulted a four year old girl who lived in the neighborhood. The interview was apparently not in response to any allegation from the child in this case, and through in limine rulings, that information was kept from the jury.
[3] In this case, a voir dire may be especially crucial. Appellant's trial counsel worked especially hard to keep the jury from learning that appellant was already convicted, pursuant to anAlford guilty plea, of sexually molesting a four year old girl. As a result, the full picture of how this case developed was never revealed at trial. The report from the Court Diagnostic 
Treatment Center that was prepared before sentencing in this case contains a narration of the history of events that may prove enlightening to a court considering the reliability of the child's statements in this case. The narrative shows that appellant was first accused of molesting his own son by an ex-wife during a bitter custody dispute, and that his ex-wife made her accusations known to all the neighbors. Appellant was granted unsupervised visitation with his son, and the neighborhood children visited his son often. He reported that he helped the four year old girl straighten her underpants after she came out of his bathroom and asked for help. He was thereafter accused of molesting the girl, and his appointed counsel advised him to accept a plea bargain and to enter anAlford guilty plea or many other charges would be brought against him. In the context of that case, the child in this case was first interviewed by the caseworker from children's services and the uniformed police officer who showed him pictures of naked people and who asked him if appellant had ever touched him. The child said no. Several months later, the child said appellant did abuse him. By the time the child was seen by the social worker and the doctor at MCO, the child had been interviewed eight to twelve times. None of the interviews were audio taped or videotaped.