[Cite as *State v. Walters*, 2018-Ohio-1175.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 28582 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DELANCEY D. WALTERS | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2016-03-0818 |

DECISION AND JOURNAL ENTRY

Dated: March 30, 2018

CARR, Judge.

{¶1} Defendant-Appellant Delacey Walters appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Walters was indicted in March 2016 on eight counts of rape and four counts of gross sexual imposition. The allegations involved two eight year-old twin girls, whose mother ("Mother") was dating and living with Walters at the time. For purposes of this appeal, the twins will be referred to as "the older twin" and "the younger twin." In April 2016, a supplemental indictment was filed charging Walters with an additional count of rape and gross sexual imposition. Those allegations involved the girls' younger sister, T.C.L., who was two years old at the time. All three girls tested positive for Chlamydia, as did Walters.

{¶3} Following a competency hearing, the trial court found the twins competent to testify at trial. The matter proceeded to a jury trial, after which the jury found Walters guilty of

all counts. The trial court sentenced Walters to an aggregate sentence of life with parole eligibility after 45 years.

{¶4} Walters has appealed, raising four assignments of error, which will be addressed out of sequence to facilitate review.

II.

**ASSIGNMENT OF ERROR IV**

THE JURY'S GUILTY VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶5} Walters argues in his fourth assignment of error that the guilty verdicts are against the manifest weight of the evidence. He points to inconsistencies in the girls' testimony at trial as compared to what they told various professionals about the abuse and to inconsistencies between what the girls told the different professionals.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶6} Walters was found guilty of nine counts of rape in violation of R.C. 2907.02(A)(1)(b) and five counts of gross sexual imposition in violation of R.C. 2907.05(A)(4).

Four counts of rape related to the younger twin, four counts related to the older twin, and one count related to T.C.L. Two counts of gross sexual imposition were associated with each of the twins and one count was associated with T.C.L.

{¶7} R.C. 2907.02(A)(1)(b) states that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." "'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A). R.C. 2907.05(A)(4) states that "[n]o person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender * * * when * * * [t]he other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." R.C. 2907.01(B) provides that "'[s]exual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

{¶8} In 2015, the twins and T.C.L. were living with Mother and Walters. During the latter part of the year, Walters would watch the three children when Mother worked. In November 2015, Mother called the twins' father ("Father") to tell him that the girls had indicated that someone was touching them. Father went over to the house and questioned the girls separately but they never gave him a name. Mother testified that the girls denied that Walters

touched them and that Walters denied touching them. At this point, Father thought Mother was going to further address the situation.

{¶9} Sometime in December or January, the girls reported to their aunt ("Aunt') that they were being touched. Aunt testified that the girls told her everything and seemed scared and nervous talking to Aunt and had their heads down the entire time. Aunt reported the allegations to Mother who started crying. Aunt told Mother that she had to go to the police or she would. The twins indicated that when Mother told Walters he denied the allegations and became angry. He broke a glass table and glass went everywhere. When Mother failed to report the abuse, Aunt told Father.

{¶10} Father called the police and also took the twins to the emergency room at Akron Children's Hospital. Prior to taking the girls, he talked to them about what happened and recorded what they told him. Those recordings were played at trial. On the recordings, one of the girls reported that when Walters woke them up for school, he made them touch his private. He told them to rub his private with his hand and told them to suck his private. She indicated that it happened twice.

{¶11} At the emergency room, on January 25, 2016, both girls were interviewed by Julia Mothersbaugh, a licensed social worker, and also underwent a medical examination. The younger twin indicated that after her Mother found out about the allegations, she asked the girls whether they wanted him to go to jail. The younger twin reported that she and the older twin slept with Walters when Mother was not home. She told Ms. Mothersbaugh that Walters made them rub his "coochie[,]" which she indicated was his private part and made them suck it two times. She described that she would be lying down on the bed on her stomach and he would be

on his back with his legs opened up. The younger twin also reported that Walters touched her "coochie" with his hand, "outside of [her] privates."

{¶12} The older twin reported that she did not feel safe at home because of Walters. The older twin told Ms. Mothersbaugh that when her Mother found out about the allegations she asked the older twin why she told and exclaimed that Walters was going to jail. The older twin recounted that Walters touched her "on [her] cupcake with his fingers and his private parts" when Mother was at work. Ms. Mothersbaugh detailed that the older twin referred to her vagina as her "cupcake." The older twin told Ms. Mothersbaugh that the older twin's clothes would be on and he "digged in our pants." The older twin stated that Walters put his fingers in her "cupcake" two times. Walters also told her to "suck it." He then put his private parts in her mouth and "pee came out of it and she tasted it." The older twin also reported that Walters made them touch his "privates" and that Walters did the "same stuff to her twin[.]"

{¶13} Ms. Mothersbaugh passed the information she gathered along to the director of the Children At Risk Evaluation ("CARE") Center, who recommended the girls undergo a full forensic interview and medical exam at the CARE Center. The information was also shared with the doctor who examined the girls that night. Ms. Mothersbaugh testified that she did not believe the children could have gotten the details from being coached and did not believe they were lying.

{¶14} After the girls went home with Father, Mother showed up at Father's home and took the girls. The girls were scheduled to go to the CARE Center in early February but Mother failed to bring them to the appointment. A social worker from Summit County Children Services Board testified that Mother was angry about the appointment at the CARE Center and did not

believe the allegations. Mother continued to live with Walters and the children thereafter went to live with grandmother.

{¶15} On February 2, 2016, Walters went to Planned Parenthood and was seen by Stacey Drahuschak, a certified nurse practitioner. Walters complained of tingling with urination and, given his symptoms, he was treated for Chlamydia with antibiotics at the office. He was also tested for the disease and the results later came back positive. The office phoned Walters and left a voice mail message and also sent a letter with results. It was recommended that he be retested in three to four months. Walters returned to the office on March 3, 2016, but as it was too soon for him to be retested, he was sent home. Ms. Drahuschak testified that Chlamydia is only transmitted through sexual intercourse.

{¶16} Mother took the twins to the CARE Center on February 24, 2016 for a forensic interview and medical examination. Both girls were interviewed by Colleen Shrout, a licensed social worker. Ms. Shrout averred that purpose of the interview was to facilitate the medical evaluation. The younger twin told Ms. Shrout that Walters was touching her and her sister. The younger twin reported that Walters told her to suck on his private and she complied. In addition, she indicated that Walters told her to rub on his private with her fingers and she did. The younger twin also told Ms. Shrout that Walters put his private part up her butt and it hurt and felt like it was bleeding. She detailed that Walters also put his private on her private and rubbed it more than once. However, when the older twin was interviewed by Ms. Shrout, the older twin denied that anything had happened to her.

{¶17} Following their interview with Ms. Shrout, the girls were examined by Donna Abbott, a certified nurse practitioner. Ms. Abbott noted no abnormal physical findings with either of the examinations. However, she said in light of the circumstances, including the

allegations, and the time that had passed, it was not surprising that there were no abnormal findings on the examination. Ms. Abbott diagnosed both girls with child sexual abuse.

{¶18} Both of the twins were tested for Chlamydia on February 24, 2016 via a urine test. The test came back positive shortly thereafter and the girls were tested again via a vaginal swab. Those tests also came back positive. T.C.L was tested thereafter and also tested positive for Chlamydia. Ms. Abbott explained that the presence of Chlamydia was diagnostic of sexual contact. She testified that the person who becomes infected has to have contact with infected secretions on the person's mucous membranes. Ms. Abbott reported that, in a male, the infected secretions could be in semen or from discharge from the penis. Chlamydia can also be asymptomatic.

{¶19} Detective Scott Rubes with the Akron Police Department, Juvenile Bureau, was responsible for investigating the allegations. Detective Rubes spoke with Walters on the phone and also interviewed Mother. Detective Rubes reported that Walters denied having Chlamydia. However, he declined to sign a waiver to release his medical records and so they had to be subpoenaed. Walters stated he was tested March 3, 2016, and asserted he was tested two weeks prior at the hospital. However, hospital records disclosed that Walters had not been seen there since 2005. Detective Rubes described Mother as very hostile and combative and he felt that she did not want to hear anything he had to say.

{¶20} Mother testified that she and Walters had unprotected sex on a regular basis and that she was regularly tested for sexually transmitted diseases and the results were always negative. She indicated that Walters denied having Chlamydia and, as she did not have it, she did not believe that Walters ever had Chlamydia. She also testified that Father did ask her to

stop the child support order for the twins he was subject to but averred that he never threatened her about it.

{¶21} Both of the twins testified at trial. The older twin testified that when she told her Mother that Walters did something with her private parts, which she listed as her butt and her "cupcake[,]" Mother started crying. After Mother told Walters, Walters kicked the glass table and it broke. She testified that Walters touched her butt one time with his hand under her underwear but denied that he touched her vagina and denied that she saw his private part. She averred that he did the same thing to her sister but denied other sexual conduct or contact. However, she did indicate that she told the social worker the truth. She testified that Mother told her to stop talking about what happened with Walters. And while she initially indicated that Father told her what to say on the recording, she later said she did not know what was meant by recording and did not know she was being recorded. She clarified that Father did not tell her what words to use and told her to tell the truth.

{¶22} The younger twin testified that she told Mother, Father, and a woman at the hospital the truth. She recounted that Walters touched her "cupcake" with his private and that she saw his private. Once, Walters also told her to suck his private and she did. He told the older twin to do so as well. In addition, Walters touched the outside of her cupcake with his hand. She further averred that Walters touched her butt with his private and that he put his private in her butt and it hurt. She indicated that both times he touched her butt with his private it hurt. However, on cross examination she testified that Walters' private did not go inside her butt, that he never touched her cupcake with his private, and that he touched the outside of her cupcake with his hand outside of her underwear.

{¶23}     After a thorough and independent review of the record, we cannot say that the jury's verdicts are against the manifest weight of the evidence.  It is true that the twins' allegations varied and that the girls were not consistent about what precisely happened.  In fact, the older twin denied any sexual abuse when she spoke with Ms. Shrout even though she had earlier reported abuse to Ms. Mothersbaugh.  However, the record is also clear that all three girls tested positive for Chlamydia as did Walters.  Ms. Drahuschak testified that Chlamydia can only be transmitted through sexual intercourse.  Accordingly, even absent the twins' allegations, there was compelling evidence that the girls' were raped and that Walters was the perpetrator.  In addition, there was evidence that Mother was unhappy about the investigation, that she did not believe that Walters had Chlamydia, and that the girls were aware that Mother was upset by the allegations.  We remain mindful that the jury had an opportunity to view the witnesses and "was in the best position to assess the credibility of the evidence presented by the parties at trial." *State v. Klingel*, 9th Dist. Lorain No. 15CA010876, 2017-Ohio-1183, ¶ 22. "[T]his Court will not overturn the [] verdict[s] on a manifest weight of the evidence challenge simply because the jury chose to believe certain witnesses' testimony." (Internal quotations and citations omitted.)  *State v. Binford*, 9th Dist. Summit No. 27950, 2016-Ohio-7678, ¶ 10.  We cannot conclude that the jury lost its way in finding Walters guilty of the counts in the indictment.

{¶24}  Walters' fourth assignment of error is overruled.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FOUND THAT THE ALLEGED EIGHT-YEAR OLD VICTIMS IN THIS CASE WERE COMPETENT TO TESTIFY AT TRIAL.

{¶25}  Walters argues in his first assignment of error that the trial court abused its discretion in concluding that the twin eight year-old victims were competent to testify.

{¶26} "'Decisions on witness competency are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion.'" *State v. Ocasio,* 9th Dist. Lorain No. 15CA010773, 2016-Ohio-4686, ¶ 15, quoting *State v. Middlesworth*, 9th Dist. Wayne No. 05CA0016, 2006-Ohio-12, ¶ 7. An abuse of discretion implies that a trial court was unreasonable, arbitrary, or unconscionable in its judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶27} Evid.R. 601(A) states that "[e]very person is competent to be a witness except * * * [t]hose of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

> In determining whether a child under ten is competent to testify, the trial court must take into consideration (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful.

*State v. Frazier*, 61 Ohio St.3d 247 (1991), syllabus; *see also State v. Mercer*, 9th Dist. Summit No. 26361, 2013-Ohio-1527, ¶ 25, quoting *Frazier* at syllabus. "Thus, the responsibility of the trial judge is to determine through questioning whether the child of tender years is capable of receiving just impressions of facts and events and to accurately relate them." *Frazier* at 251.

{¶28} The trial court held a hearing to determine the competency of the two girls to testify at trial. Both girls were questioned at the hearing by the trial court and both attorneys. The girls were able to relay information about their birthdays, age, address, family, chores, and school, including their favorite subjects and what they had for lunch at school. The younger twin was able to answer questions related to what she had done that day and the older twin was able to discuss what she did for her birthday. The children were aware that Christmas was approaching

and discussed what they hoped to receive as presents. The girls were able to differentiate between the truth and a lie, understood that telling lies was wrong, and relayed that there were consequences for telling lies.

{¶29} We note that Walters has not pointed to any portion of the older twin's questioning that he found indicative of a lack of competency; instead, his arguments focus on the fact that the younger twin could not recall the names of certain people who were involved with the case and that she was unfamiliar with the legal system. However, the fact that the younger twin did not know anything about trials, judges, or the legal system or that she was unable to remember certain people's names does not establish her incompetence to testify. *See Frazier* at syllabus. Given the evidence before it, the trial court could have reasonably concluded that the factors outlined in *Frazier* were satisfied. Accordingly, we cannot say that the trial court abused its discretion in determining that the girls were "capable of receiving just impressions of facts and events and to accurately relate them." *Id.* at 251.

{¶30} Walters' first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ALLOWED STATE'S WITNESSES TO TESTIFY ABOUT HEARSAY STATEMENTS THAT THE ALLEGED VICTIMS MADE TO SOCIAL WORKERS DURING THEIR INTERVIEWS.

{¶31} Walters argues in his second assignment of error that the trial court erred in allowing the State's witnesses to testify about hearsay statements the victims made to social workers during the victims' interviews. While Walters briefly mentions the Confrontation Clause in his brief on appeal, he develops no argument explaining how his right to confront witnesses was violated. *See State v. Just,* 9th Dist. Wayne No. 12CA0002, 2012-Ohio-4094, ¶

24 (noting that where the victims testified at trial no Confrontation Clause violation occurred). Thus, we decline to further address that issue in this appeal.

{¶32} "A trial court possesses broad discretion with respect to the admission of evidence." (Internal quotations and citations omitted.) *Id.* at ¶17. Therefore, this Court generally applies an abuse of discretion standard when reviewing a trial court's decision to admit the statements of a child victim under the medical hearsay exception contained in Evid.R. 803(4). *Id.* An abuse of discretion means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶33} Evid.R. 803(4) provides a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." "Regardless of whether a child less than ten years old has been determined to be competent to testify pursuant to Evid.R. 601, the child's statements may be admitted at trial as an exception to the hearsay rule pursuant to Evid.R. 803(4) if they were made for purposes of medical diagnosis or treatment." *Just* at ¶ 18, quoting *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, syllabus. Considerations that should be taken into account in making that determination include the manner in which the child was questioned, whether there was a motive to fabricate, and whether the child understood the need to tell the truth. *See Muttart* at ¶ 49. In addition, the court may consider the child's age and whether the proper protocol for interviewing children alleging sexual abuse was followed. *See id*.

{¶34} Walters' argument is somewhat difficult to follow. To the extent that Walters challenges the playing of the DVD of the children's interviews with Ms. Shrout during trial,

Walters has not demonstrated he objected to the interviews being played, nor can the Court locate where he did so. *See* Loc.R. 7(F); *State v. Hill*, 9th Dist. Summit No. 26519, 2013-Ohio-4022, ¶ 18. Thus, Walters has not preserved this argument for appeal. *See Hill* at ¶ 18. Further, as he has not argued plain error on appeal, we decline to construct an argument on his behalf. *Id.*

{¶35} With respect to the testimony of the State's witnesses, it is unclear whose testimony he challenges. Walters mentions Ms. Mothersbaugh, Ms. Shrout, Detective Scott Rubes and Annette Lucarelli and asserts that they all "were allowed, over objection, to testify as to what the children told them." However, the only objection Walters points to in his brief is the one his counsel made during Ms. Mothersbaugh's testimony. Walters has pointed to no point in the record where he objected to Ms. Shrout's, Detective Rubes', or Ms. Lucarelli's testimony. *See* Loc.R. 7(F). Further, in reviewing the issue, we have not encountered a place in those witnesses' testimony where Walters' counsel specifically objected on the basis he now argues. Accordingly, Walters has not demonstrated that he preserved this issue for review. *See* Loc.R. 7(F); *Hill* at ¶ 18. Further, as Walters has not argued plain error on appeal, we decline to consider the argument with respect any of the witnesses aside from Ms. Mothersbaugh. *See id.*

{¶36} The objection that Walters points to in his brief occurred as Ms. Mothersbaugh began discussing her interview with the younger twin. Walters' counsel objected asserting that the line of questioning was testimonial and that Ms. Mothersbaugh had no medical training. The State responded that Ms. Mothersbaugh was a social worker in the emergency room and that it was part of her job to take the history from the child to facilitate the medical examination and any treatment the child would need. Thus, the State argued that the testimony fell within the hearsay exception. Ultimately, the trial court overruled Walters' counsel's objection. The trial

court noted that there was no testimony that the information was gathered for law enforcement purposes; instead, the trial court found it was gathered for purposes of diagnosis.

{¶37} Ms. Mothersbaugh was a licensed independent social worker who, at the time of trial, in addition to her full-time job with Summit County Children Services, also worked one night a week at Akron Children's Hospital in the emergency room. At trial, she described the training she received, which included specific training on how to interview children who alleged that they had been sexually abused. On January 25, 2016, Ms. Mothersbaugh was working at Akron Children's Hospital when Father brought the twins in. Ms. Mothersbaugh interviewed both girls and documented what they reported in the girls' medical records. Ms. Mothersbaugh explained that she did a cursory "first responder" assessment which she described as "gather[ing] basic background information[,]" that is then shared with the medical provider and the director of the CARE Center, who would make recommendations and do a more in depth forensic interview. As part of the procedure, Ms. Mothersbaugh also shares the CARE Center's recommendations with the doctor. Thus, the medical doctor is able to consider all of the above information in deciding how to medically treat the children. In light of what Ms. Mothersbaugh told the CARE Center, the CARE Center recommended that the girls be seen by a medical provider at the emergency department and that they also be seen in two weeks for a full evaluation at the CARE Center. A doctor did examine the girls after the interview.

{¶38} Walters' main criticism appears to be that the trial court failed to explicitly discuss each of the factors in *Muttart* in overruling his objection. However, he points to no authority requiring the trial court to discuss the factors. *See* App.R. 16(A)(7); *see also Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 49 (describing factors that should be *considered*). He also maintains that the hearsay statements were unnecessary and overly prejudicial because the girls

did testify at trial. Yet, Walters again fails to point to any case law that would indicate that the statements were inadmissible if the victims testified. *See* App.R. 16(A)(7); *Just*, 2012-Ohio-4094, at ¶ 18. Finally, Walters has not developed any argument explaining how the considerations in *Muttart* weighed in favor of concluding that the purpose of the girls' statements to Ms. Mothersbaugh was for something other than medical treatment or diagnosis. *See* App.R. 16(A)(7); *see also State v. Walker*, 1st Dist. Hamilton No. C-060910, 2007-Ohio-6337, ¶ 32-39 (concluding statements made by child to social worker in emergency room setting that were relayed to other medical professionals were for purposes of medical treatment or diagnosis). In fact, Walters has not specifically detailed any statement of the girls that he believes was not made for the purpose of medical treatment or diagnosis. Based on the arguments and the record before us, we cannot say that Walters has demonstrated the children's statements to Ms. Mothersbaugh were for purposes other than medical treatment or diagnosis. Thus, Walters has not demonstrated that the trial court abused its discretion in admitting the statements.

{¶39} Walters' second assignment of error is overruled.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO GRANT DEFENSE COUNSEL'S MOTION TO REMOVE A JUROR AND MOTION FOR A MISTRIAL.

{¶40} Walters argues in his third assignment of error that the trial court erred in failing to remove a juror and in failing to grant a mistrial. The situation arose when, after the close of evidence, and prior to beginning deliberations, a juror and Walters had an interaction in a hallway.

{¶41} "In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace

an affected juror." (Internal quotations and citation omitted.) *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 160; *see also State v. Thomas*, 9th Dist. Summit No. 26893, 2014-Ohio-2920, ¶ 34. "The granting of a mistrial is necessary only when a fair trial is no longer possible. The remedy for claims of juror partiality is a hearing in which the defendant has an opportunity to prove actual bias." (Internal quotations omitted.) *Conway* at ¶ 160. "The defense must establish that the improper communication biased the juror." *Id.* A presumption of prejudice only attaches under certain circumstances. *See id.* at ¶ 161, citing *State v. Murphy*, 65 Ohio St.3d 554, 575 (1992).

{¶42} In the instant matter, on the morning of January 31, 2017, Walters alerted defense counsel to some issues of concern regarding some members of the jury. That same day, immediately prior to the trial court reading and accepting the jury's verdict in open court, defense counsel raised the issues with the trial court. The trial court addressed those concerns during a hearing at which attorneys for both sides were present. Counsel for Walters waived Walters' presence.

{¶43} One of the issues raised was that Walters believed that a couple of the jurors may have seen him in handcuffs when he was being transported within the courthouse. One juror who was questioned acknowledged seeing Walters in handcuffs and shackles along with other inmates when she returned from lunch, prior to beginning deliberations on January 30, 2017, around 3:00 p.m. She stated that she was alone walking through the hallway when she saw the inmates, including Walters, and that she had to "move against the wall, toward the wall to kind of let them pass." She told the court that Walters "was smiling and * * * giggled and looked at [her.]" In response, she told him, "Don't look at me like that" and walked away.

**{¶44}** The juror denied discussing that Walters was handcuffed or shackled with other members of the jury, but did admit to discussing her interaction with Walters with other members of the jury, but only did so after the jury had concluded deliberations and the verdict forms were signed. The juror indicated that the fact that Walters was in handcuffs and shackles did not influence her at all, nor did she make any assumptions based upon it.

**{¶45}** After the juror was excused, the trial court asked whether any other jurors should be questioned, and Walters' counsel said that he did not think so. Walters' counsel also did not ask to further question the juror at issue. However, Walters' counsel did move to seat an alternate juror in the juror's place. Walters' counsel was troubled by the interaction as it gave him the impression that the juror formed a negative opinion of Walters and as to whether he was taking the trial seriously. Walters' counsel felt that "it was clear that [the juror] was offended].]" The State expressed concern that, if an alternate was seated, and the jury was required to restart deliberations anew, it could create more problems given that the juror at issue had discussed her interaction with Walters with other members of the jury after they completed the verdict forms. Thus, seating the alternate might result in more prejudice than leaving the juror in place.

**{¶46}** Ultimately, Walters' counsel seemed to agree that seating the alternate was not the best course of action. He stated:

> [I]n light of the circumstances, [] the Court should declare a mistrial because now I feel very strongly that [the juror] should be removed, and now that the point was brought up that [the juror] may have tainted the other jurors, after the fact, because even if [the juror is] removed and we have the alternate come in, now these jurors are deliberating with this information and what they probably talked about regarding him being shackled and the interaction that [the juror] had with him. So what I would respectfully request is that the Court declare a mistrial[.]

The trial court then denied the request to seat the alternate and the motion for a mistrial. Thereafter, the verdicts were read and accepted in open court.

**{¶47}** With respect to Walters' argument that the alternate should have been seated, we conclude that Walters' counsel abandoned that contention. However, even if Walters' counsel's statement was not viewed as an abandonment of that argument, at the least, it seems that the statement acknowledged the problematic nature of seating the alternate. Accordingly, we conclude that Walters cannot demonstrate the trial court abused its discretion in failing to seat the alternate juror.

**{¶48}** With respect to the trial court's denial of Walters' counsel's motion for a mistrial, we likewise are not persuaded that the trial court abused its discretion. While the interaction between the juror and Walters certainly is concerning and gives us pause, we cannot say that the trial court abused its discretion. Walters has not argued that this situation presents us with facts warranting the conclusion that prejudice should be presumed, and we are not inclined to develop such an argument on his behalf. *See* App.R. 16(A)(7); *Cardone v. Cardone*, 9th Dist. Summit Nos. 18349, 18673, 1998 Ohio App. LEXIS 2028, *22 (May 6, 1998). Accordingly, Walters was required to demonstrate that the juror was biased. *Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, at ¶ 160. Walters' counsel was provided the opportunity to question the juror but failed to ask whether the juror's interaction with Walters influenced her in any way. The juror did not sua sponte report that it did or indicate any fear of, or resentment towards, Walters. While it certainly would have been within the province of the trial court to pose such questions, Walters has not argued that the trial court's failure to do so was an abuse of discretion. *See* App.R. 16(A)(7); *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 61 ("The scope of voir dire is generally within the trial court's discretion, including voir dire conducted during trial to investigate jurors' reaction to outside influences.") (Internal quotations and citations omitted.).

**{¶49}** Further, to the extent Walters may be asserting prejudice based upon the juror seeing Walters in handcuffs, the juror indicated that she was not influenced by it. This Court has noted that "[a] juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court." *State v. Taylor,* 9th Dist. Lorain Nos. 10CA009922, 10CA009915, 2012-Ohio-1263, ¶ 65, quoting *State v. Philips,* 74 Ohio St.3d 72, 89 (1995). Moreover, we have also acknowledged that "[w]hen a [juror's] view of the defendant in restraints is brief, inadvertent, and outside the courtroom, there is but a slight risk of prejudice." (Internal quotations and citation omitted.) *State v. Halsell*, 9th Dist. Summit No. 24464, 2009-Ohio-4166, ¶ 7.

**{¶50}** Based on the record before us, and in light of Walters' limited arguments on appeal, Walters has failed to demonstrate the juror was biased. Walters thus has not demonstrated that the trial court abused its discretion in denying his motion for a mistrial.

**{¶51}** Walters' third assignment of error is overruled.

III.

**{¶52}** Walters' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

SCHAFER, P. J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

GREGORY PRICE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.