[Cite as *In re D.B.*, 2025-Ohio-4451.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: D.B.

C.A. No.     31282

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DL 23 09 0864

DECISION AND JOURNAL ENTRY

Dated: September 24, 2025

CARR, Judge.

{¶1} Appellant, D.B., appeals his adjudication as a delinquent child in the Summit County Court of Common Pleas, Juvenile Division. This Court affirms.

I.

{¶2} D.B. was thirteen years old when these events transpired. He and his younger brother were living with their aunt and her seven-year-old son, C.B. D.B. and his aunt had their own bedrooms, but his brother and C.B. shared one. Their shared bedroom had a bunk bed with a twin-sized mattress on top and a larger mattress on the bottom.

{¶3} One evening, D.B., his brother, and C.B. were all lying on the bottom mattress of the bunk bed watching television. The aunt felt unwell and was resting in her own bedroom. The boys checked in on her periodically but otherwise kept to themselves. When they grew quiet for too long, the aunt went to check on them.

{¶4} As the aunt opened the door to the shared bedroom, she immediately noticed two things. The first was that D.B.'s brother had fallen asleep. The second was that D.B. was lying on top of her son, both of whom were positioned face down, in the middle of the bed. D.B. immediately rolled off C.B. when the aunt came into the room. He held a blanket to himself, and the aunt began yelling and grabbing for it. She saw C.B. trying to pull up his pants as she struggled to yank the blanket from D.B. When she succeeded, she saw that D.B.'s pajama pants were unbuttoned. The aunt asked her son whether D.B. was "humping on you[,]" and her son responded affirmatively.

{¶5} The aunt called the police as well as her brother and niece. Family members arrived before the police, and they questioned D.B. while yelling at him. When the police arrived, they conducted interviews and removed D.B. from the home. The aunt then took C.B. to the hospital. At the hospital, he underwent an interview at the CARE Center and a medical examination. He disclosed that D.B. had repeatedly reached into his (C.B.'s) pajama pants, touched his genitals, asked C.B. to "put my privates up him[,]" and tried to put his privates "up [C.B.'s] butt."

{¶6} As a result of the foregoing incident, D.B. was charged with gross sexual imposition. His trial took place before a magistrate. During its case-in-chief, the State presented testimony from the aunt and the social worker who interviewed C.B. at the CARE Center. The State also introduced the recording of C.B.'s interview and his medical records. D.B. objected to their admission, but the magistrate overruled his objections. At the conclusion of the trial, the magistrate adjudicated D.B. delinquent. The juvenile court immediately entered judgment on the magistrate's decision and set the matter for a dispositional hearing.

{¶7} D.B. filed objections to the magistrate's decision and supplemented his filing once he obtained a trial transcript. While his objections were pending, the juvenile court issued its

dispositional orders. The court then ruled on his objections. In doing so, the court confirmed its prior orders but also ordered the matter remanded to the magistrate for further proceedings.

{¶8} D.B. appealed from the juvenile court's judgment, but this Court dismissed his appeal. Because the juvenile court's order included a remand to the magistrate, we found that it contemplated further trial court action. Thus, we concluded that the juvenile court had yet to issue a final, appealable order. *See In re: D.B.*, 9th Dist. Summit No. 31177 (Oct. 28, 2024).

{¶9} Following our dismissal, D.B. moved the juvenile court to partially reconsider its judgment. D.B. asked the court to remove from its judgment the unnecessary remand to the magistrate for further proceedings. The juvenile court granted D.B.'s motion and executed a new judgment entry that omitted the remand.

{¶10} D.B. now appeals from the juvenile court's judgment and raises four assignments of error for review. For ease of analysis, we consolidate several of the assignments of error.

II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT'S ADMITTING C.B.'S STATEMENTS VIOLATES ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

### ASSIGNMENT OF ERROR II

IN THE ALTERNATIVE, THE TRIAL COURT'S ADMITTING C.B.'S STATEMENTS VIOLATES THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN ADMITTING C.B.'S STATEMENTS UNDER EVID.R. 803(4).

{¶11} In each of the foregoing assignments of error, D.B. challenges the admission of statements C.B. made at the hospital. The State introduced those statements through the testimony of the social worker who interviewed C.B., the recording of his interview, and his medical records.

According to D.B., the statements were improperly admitted because they violated his rights under the U.S. and Ohio Constitutions and constituted hearsay under the Ohio Rules of Evidence. For the following reasons, we reject his arguments.

### Federal Confrontation Clause & Ohio Rules of Evidence

{¶12} Generally, "[t]his Court reviews a trial court's action with respect to a magistrate's decision for an abuse of discretion." *Tabatabai v. Tabatabai*, 2009-Ohio-3139, ¶ 17 (9th Dist.). "In so doing, we consider the trial court's action with reference to the nature of the underlying matter." *Tabatabai* at ¶ 18. "Evidentiary rulings that implicate the Confrontation Clause are reviewed de novo . . . ." *State v. Calhoun*, 2021-Ohio-1713, ¶ 14 (9th Dist.). Consequently, we must conduct "an independent review of the trial court's decision without any deference to [its] determination." *State v. Consilio*, 2006-Ohio-649, ¶ 4 (9th Dist.).

{¶13} The federal Confrontation Clause affords criminal defendants the right to confront witnesses against them. U.S. Const., amend. VI. It applies to testimonial statements. *State v. Stahl*, 2006-Ohio-5482, ¶ 15. Before a testimonial statement from an unavailable declarant can be admitted at trial, a criminal defendant must have had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). "[T]estimonial statements are those made for 'a primary purpose of creating an out-of-court substitute for trial testimony.'" *State v. Maxwell*, 2014-Ohio-1019, ¶ 40, quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). "If a statement's primary purpose is anything else, the statement is nontestimonial." *Id.* at ¶ 40.

{¶14} "Statements made for the purpose of medical diagnosis and treatment are nontestimonial." *State v. Arnold*, 2010-Ohio-2742, ¶ 28. *See also* Evid.R. 803(4) (providing a hearsay exception for statements made for the purpose of medical diagnosis and treatment). Conversely, "statements made to agents of the police for the primary purpose of forensic

investigation are testimonial." *Arnold* at ¶28. "'Considerations that should be taken into account in making [a primary purpose] determination include the manner in which the child was questioned, whether there was a motive to fabricate, and whether the child understood the need to tell the truth.'" (Bracketed text in original.) *State v. Weaver*, 2018-Ohio-2998, ¶ 12 (9th Dist.), quoting *State v. Walters*, 2018-Ohio-1175, ¶ 33 (9th Dist.). "The court also may consider 'the child's age and whether the proper protocol for interviewing children alleging sexual abuse was followed.'" *Id.* at ¶ 12, quoting *Walters* at ¶ 33. "[T]he same interview or interrogation might produce both testimonial and nontestimonial statements." *Arnold* at ¶ 41, citing *Davis v. Washington*, 547 U.S. 813, 828-829 (2006).

{¶15} We begin by outlining the evidence introduced at trial. The aunt testified that she had custody of D.B. and his younger brother. She also had a seven-year-old son, C.B., who shared a bedroom with D.B.'s brother. On the evening of the incident, all three boys were watching television in the shared bedroom. The aunt testified that she was resting in her own bedroom because she felt unwell. She eventually went to check on the boys, who had been quiet for some time. The door to the shared bedroom was closed, so the aunt had to open it to step into the room. When she did so, she saw that D.B.'s brother had fallen asleep. She testified that D.B. and C.B. were in the middle of the bed, but she could not initially see C.B. because D.B. was lying on top of him. D.B. and C.B. were positioned face down such that D.B.'s chest was on C.B.'s back. As the aunt entered the room, D.B. rolled off C.B.

{¶16} The aunt testified that she began yelling, cursing, and demanding to know what D.B. had done as he denied any wrongdoing. She saw C.B. hurrying to pull up his pants while D.B. tried to cover himself with a blanket. The aunt grabbed the blanket and attempted to snatch it from D.B. as he held on. The two struggled for a short while before D.B. released the blanket.

The aunt testified that, when she succeeded in taking the blanket from D.B., she could see the flap of his pajama pants was open. She testified that the pants had a button, and D.B. usually had them buttoned so that he "wouldn't walk around inappropriately."

{¶17} The aunt testified that she asked C.B. whether D.B. was "humping on you[,]" and C.B. answered affirmatively. She testified that C.B. appeared to be afraid when he answered her question. The aunt called the police and, after they removed D.B. from her home, she took C.B. to the hospital.

{¶18} A social worker from the CARE Center met with the aunt and C.B. at the hospital. The social worker testified that she was independently licensed but worked one night a week at the CARE Center. She explained that her role was to act as a first responder in the emergency room. She would interview children and parents and provide that information to the medical team so they would know what steps to take next. She testified that she was trained to work with children and had completed forensics training through the Ohio Welfare Training Program. She testified that she interviewed C.B. because the aunt requested a medical examination and the interview was the first step in the medical evaluation process.

{¶19} The social worker testified that she spoke with the aunt and C.B. to gain background information from them before formally interviewing C.B. She referred to their initial interaction as a first responder interview. She then took C.B. to a separate room for a longer interview, and the State played the recording of that interview at trial. The social worker testified that she interviewed C.B. for the purpose of medical diagnosis and treatment. During the recorded interview, she told him that the purpose of his interview was to make sure his body was safe and healthy. She told him that he would be having a medical check-up after the interview. She also told him that the interview was being recorded and that other people like police officers, social

workers, or lawyers could look at the interview to make sure he stayed safe. The social worker admitted that her interviews were viewed and used by both law enforcement and medical personnel. Before speaking with C.B. about the incident that occurred, the social worker spent time reviewing the rules for the interview with him. She explained that he was only to tell the truth, he should tell her if he did not know something, and he should correct her if she got something wrong. The social worker had him practice following each rule through an example.

{¶20} C.B. made a variety of statements during his recorded interview. He agreed that he was sharing a bed with D.B. and D.B.'s brother while the three of them were watching television. He described the way he and the other boys were lying on the bed. C.B. stated that D.B.'s brother fell asleep before D.B. "started acting gay." When asked what that meant, C.B. said that D.B. began moaning and trying to touch his (C.B.'s) privates. C.B. said that he told D.B. to stop when D.B. went to touch him. Nevertheless, D.B. repeatedly reached into his (C.B.'s) pajama pants, touched his genitals, asked C.B. to "put my privates up him[,]" and tried to put his privates "up [C.B.'s] butt." C.B. described what happened when the aunt came into the bedroom. He also answered questions about D.B.'s clothing and his own clothing. C.B. told the social worker that D.B.'s pajama pants were down. He said that D.B. kept pulling his (C.B.'s) pajama pants down while C.B. kept trying to pull them back up. When the social worker asked whether D.B. had said anything during the incident, C.B. responded, "gay words." The social worker asked C.B. what that meant, and C.B. responded that D.B. was "moaning" and "saying daddy." C.B. denied that anything came out of D.B.'s penis during the encounter. He testified that this type of situation had never happened before and that D.B. had never threatened him.

{¶21} The social worker testified that she was well versed in forensic interviewing. She agreed that it was important to ask open-ended questions during an interview because some

children are easily influenced. The social worker admitted that, at times, she failed to ask C.B. open-ended questions. She explained that she sometimes repeated what C.B. had just said because he was very quiet, she had difficulty hearing him, and she wanted to make sure that she understood him correctly. She also explained that she prompted C.B. a few times based on information he had told her during his first responder interview. Accordingly, most of that information still came from C.B.

{¶22} On cross-examination, the social worker admitted a single instance where the formatting of her questioning was inappropriate. She asked C.B. whether D.B.'s clothes were on or off or something else during the incident. C.B. responded that D.B. had his pajamas on. The social worker then asked, "so, they were pulled up?" C.B. responded, "well, when my mom walked in, he tried to pull them up." The social worker then asked, "so, his pajama pants were down when he was doing that to you?" C.B. answered yes. The social worker admitted that her final question in that exchange was not appropriate based on C.B.'s prior response because it was a leading question and, before she asked it, C.B. had not told her that D.B.'s pajama pants were down.

{¶23} The magistrate determined that the statements C.B. made during his CARE Center interview were neither testimonial nor hearsay because they were made for the purpose of medical diagnosis and treatment. In his objections to the magistrate's decision, D.B. argued that the magistrate erred by admitting C.B.'s statements because (1) his CARE Center interview was conducted for a forensic purpose rather than a medical one; (2) D.B. was never subject to cross-examination; and (3) the admission of the statements affected the outcome of the trial. D.B. argued that the statements the social worker recorded in C.B.'s medical records were likewise inadmissible for those same reasons.

{¶24} In ruling on D.B.'s objections to the magistrate's decision, the juvenile court noted that CARE Center interviews serve a dual purpose, and thus, can produce both testimonial and nontestimonial statements. The court found that most of C.B.'s statements were nontestimonial because they were elicited for the purpose of medical diagnosis and treatment. Those statements included C.B.'s description of D.B.'s actions in touching his genitals and trying to put his penis "up [C.B.'s] butt." The juvenile court found that other statements were testimonial because they only served a forensic purpose. Those statements included C.B.'s description of D.B.'s behavior as "gay" and his statements that D.B. was moaning and "saying daddy" during the encounter. The juvenile court found that the magistrate erred by admitting C.B.'s testimonial statements. Nevertheless, it concluded that the error was harmless beyond a reasonable doubt because the testimonial statements did not contribute to D.B.'s finding of delinquency. Thus, the juvenile court overruled D.B.'s objections.

{¶25} D.B. argues that the juvenile court erred when it overruled his objections to the magistrate's decision. He argues that nearly all C.B.'s statements were testimonial because they served a forensic or investigative purpose. According to D.B., those statements included: (1) C.B.'s description of where he, the other boys, and the aunt were located during the incident; (2) C.B.'s description of his and D.B.'s clothing; (3) C.B.'s identification of D.B. as the perpetrator; and (4) C.B.'s description of what D.B. allegedly said during the incident. D.B. notes that there was no ongoing emergency at the time C.B. was interviewed. Instead, he argues the interview was conducted to aid the police in their investigation. He notes that the social worker did not even ask C.B. how his body felt until the end of the interview. Instead, she stressed that the interview was for his safety and that police officers and lawyers would review it to help keep him safe. According to D.B., the social worker failed to limit herself to open-ended questions, fed C.B. answers, and

acted as an agent of law enforcement. He argues that the admission of C.B.'s statements violated his rights under the federal Confrontation Clause because they were testimonial and admitted without a prior opportunity for cross-examination. Further, he argues that C.B.'s statements amounted to hearsay because they were not made for the purpose of medical diagnosis and treatment.

{¶26} As previously noted, "[s]tatements made for the purpose of medical diagnosis and treatment are nontestimonial." *Arnold*, 2010-Ohio-2742, at ¶ 28. They are not barred by the Confrontation Clause or the rules of hearsay. *See id.* at paragraph two of the syllabus; Evid.R. 803(4). C.B. was only seven years old at the time of his interview, the social worker stressed the importance of him telling the truth, and the record does not disclose that he possessed any apparent motive to fabricate the allegations he made against D.B. *See Weaver*, 2018-Ohio-2998, at ¶ 12 (9th Dist.), quoting *Walters*, 2018-Ohio-1175, at ¶ 33 (9th Dist.). The social worker testified that C.B.'s interview was the first step in the diagnostic process. She testified that it served the primary purpose of medical diagnosis and treatment. Indeed, at the start of the interview, she told C.B. that he was being interviewed to keep his body safe and healthy and that he would receive a medical check-up when they were finished. It is undisputed that C.B. received a medical exam after the interview.

{¶27} Although D.B. claims that nearly all C.B.'s statements were testimonial, "[t]his Court has held that statements identifying a perpetrator, describing instances of abuse, and describing the manner in which the perpetrator touched the victim's body are all admissible as statements made for the purpose of medical diagnosis and treatment." *Weaver* at ¶ 24. Thus, the juvenile court correctly determined that C.B.'s statements about how D.B. touched his genitals and tried to insert his penis "up [C.B.'s] butt" were nontestimonial. We also agree with the juvenile

court that the magistrate's error in admitting any testimonial statements was harmless beyond a reasonable doubt. *See State v. Conway*, 2006-Ohio-791, ¶ 78 ("A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt.").

{¶28} A constitutional error is harmless beyond a reasonable doubt if there is no "reasonable possibility that the evidence complained of might have contributed to the [adjudication of delinquency]." *Id.*, citing *Chapman v. California*, 386 U.S. 18, 23 (1967). The State presented the testimony of the aunt, who described what happened when she entered the bedroom C.B. shared with D.B.'s younger brother. She testified that D.B. was lying on top of C.B., rolled off him when she entered the room, tried to hold a blanket to himself, and had his pajama pants unbuttoned. She also testified that C.B. had his pants down, appeared scared, and confirmed that D.B. had been "humping on him[.]" Moreover, the State presented the nontestimonial statements C.B. made to the social worker, wherein he said that D.B. repeatedly touched his genitals and tried to insert his penis "up [C.B.'s] butt." Even if C.B.'s interview resulted in some testimonial statements, there is no reasonable probability that those statements contributed to the adjudication of delinquency. Thus, their admission was harmless beyond a reasonable doubt.

{¶29} Upon review, D.B. has not shown that the juvenile court erred by rejecting his argument under the U.S. Constitution and the Ohio Rules of Evidence. Consequently, his second and third assignments of error are overruled.

## Ohio Confrontation Clause

{¶30} D.B. also argues that the juvenile court erred by admitting C.B.'s statements because Ohio's Confrontation Clause is broader than the Sixth Amendment's Confrontation Clause. The juvenile court found the two clauses to be coextensive. D.B. argues that the juvenile court erred in its legal determination because, in *State v. Storch*, 66 Ohio St.3d 280 (1993), the

Ohio Supreme Court "concluded that the Ohio Constitution's confrontation right provided 'greater' protections than the U.S. Constitution's."

{¶31} In *Storch*, the Ohio Supreme Court considered the admissibility of a three-year-old child's statements to her mother, a physician, and the head of a child abuse investigation unit. *Storch* at 280-284. The Supreme Court compared the text of the Sixth Amendment's Confrontation Clause with that of Ohio's Confrontation Clause to aid in the interpretation of newly adopted Evid.R. 807. *Id.* at 287-295. The Supreme Court noted that the admission of a statement under the federal constitution could still violate Ohio's constitutional right of confrontation in certain instances. *Id.* at 291. Nevertheless, its holding was specifically limited to Evid.R. 807, its constitutionality, and its application. *See id.* at paragraphs one and two of the syllabus. *See also State v. Muttart*, 2007-Ohio-5267, ¶ 46, fn. 5.

{¶32} "The State need not satisfy the rigors of Evid.R. 807[] if [a] child's statement can be admitted through a different hearsay exception." *State v. Lortz*, 2008-Ohio-3108, ¶ 20 (9th Dist.). One such exception is Evid.R. 803(4), which permits the introduction of statements made for the primary purpose of medical diagnosis or treatment. *In re E.L.*, 2019-Ohio-1490, ¶ 8 (9th Dist.). In *State v. Arnold*, the Ohio Supreme Court specifically addressed the interplay between the federal Confrontation Clause, Ohio's Confrontation Clause, and Evid.R. 803(4). *See Arnold*, 2010-Ohio-2742, ¶ 12-44. In so doing, the Supreme Court wrote: "'Section 10, Article I [of the Ohio Constitution] provides no greater right of confrontation than the Sixth Amendment.'" *Id.* at ¶ 12, quoting *State v. Self*, 56 Ohio St.3d 73, 79 (1990). Thus, in the context of child advocacy centers and Evid.R. 803(4), the Supreme Court has recognized that the two Confrontation Clauses are coextensive. The *Arnold* decision was issued 17 years after *Storch*.

{¶33} D.B. has not shown that he is entitled to greater rights under the Ohio Constitution. The juvenile court correctly determined that the Sixth Amendment Confrontation Clause and Ohio's Confrontation Clause are to be interpreted coextensively in the context of Evid.R. 803(4). D.B.'s argument to the contrary lacks merit. Accordingly, his first assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

IN THE ALTERNATIVE, THERE IS INSUFFICIENT EVIDENCE TO SUSTAIN D.B.'S ADJUDICATION.

{¶34} In his fourth assignment of error, D.B. argues that his adjudication of delinquency is based on insufficient evidence. We do not agree.

{¶35} "When considering this issue, this Court applies the same standard of review as that applied in an adult criminal context." *In re L.M.*, 2012-Ohio-1025, ¶ 7 (9th Dist.). When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶36} Relevant to this appeal, gross sexual imposition occurs when a person has sexual contact with another and "[t]he other person . . . is less than thirteen years of age, whether or not the offender knows the age of that person." R.C. 2907.05(A)(4). "'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, [or] pubic region . . . for the purpose of sexually arousing or gratifying either person." R.C.

2907.01(B). "A person's purpose or intention may be proven through direct or circumstantial evidence." *State v. Persinger*, 2014-Ohio-4125, ¶ 5 (9th Dist.). "[I]n the absence of direct testimony regarding sexual arousal or gratification, the trier of fact may infer a purpose of sexual arousal or gratification from the 'type, nature and circumstances of the contact, along with the personality of the defendant.'" *State v. Antoline*, 2003-Ohio-1130, ¶ 64 (9th Dist.), quoting *State v. Cobb*, 81 Ohio App.3d 179, 185 (9th Dist. 1991).

{¶37} D.B. argues that the State presented insufficient evidence to sustain his adjudication of delinquency because, "assuming the trial court properly excluded C.B.'s statements about D.B. allegedly 'moaning' and saying 'daddy' while touching C.B.," there was no evidence that he touched C.B. for the purpose of sexual gratification.

{¶38} Viewing the evidence in a light most favorable to the State, we conclude that sufficient evidence was presented whereby the trier of fact could find beyond a reasonable doubt that D.B. touched C.B.'s erogenous zones for the purpose of sexual gratification. The aunt testified that D.B. rolled off C.B. as soon as she came into the room and attempted to hide himself beneath a blanket. She testified that she had to snatch the blanket away from D.B. When she successfully did so, she saw that D.B.'s pajama pants were unbuttoned. A rational trier of fact could have concluded that D.B. immediately rolled off C.B. and held a blanket to himself to hide the fact that his pajama pants were undone and/or that he was sexually aroused. Moreover, the State introduced C.B.'s statements that D.B. repeatedly touched his genitals and tried to insert his penis "into [C.B.'s] butt[.]" That evidence eliminated the possibility of accidental contact. Even without the evidence of D.B. moaning or saying "daddy[,]" the State set forth circumstantial evidence that he repeatedly touched C.B.'s erogenous zones for the purpose of sexual gratification. D.B. has not

shown that his adjudication of delinquency is based on insufficient evidence. As such, his fourth assignment of error is overruled.

III.

{¶39} D.B.'s assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

STEVENSON, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

JOSEPH SHELL, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.